**Augustus F. HEALD, Petitioner-Appellant,**

v.

**Garrell S. MULLANEY, Warden, Maine State Prison, et al., Respondents-Appellees.**

No. 74-1171.

United States Court of Appeals, First Circuit.

Heard Sept. 10, 1974.

Decided Nov. 13, 1974.

Certiorari Denied Feb. 24, 1975.
See 95 S.Ct. 1339.

**1242**

Peter L. Murray, Portland, Me., by appointment of the Court, with whom Murray, Plumb & Murray, Portland, Me., was on brief, for petitioner-appellant.

John W. Benoit, Jr., Deputy Atty. Gen., Augusta, Me., for respondents-appellees.

Before COFFIN, Chief Judge, MOORE, Senior Circuit Judge,* and CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Augustus F. Heald appeals from a denial by the district court of his petition for writ of habeas corpus. Heald is serving a sentence imposed by the Penobscot County, Maine, Superior Court, after his conviction by a jury as an accessory before the fact to an armed robbery. The only issue on appeal arises from the state trial judge's instruction that the jury make special findings in the event of a not guilty verdict. While disapproving the instructions, the Maine Supreme Judicial Court rejected Heald's contention that the error was of constitutional dimension or required reversal of the conviction. State v. Heald, 307 A.2d 188 (Me.1973). The district court agreed. We affirm.

Heald was tried on two indictments, one charging him as an accessory before the fact, and another as accessory after the fact, to a robbery committed on September 16, 1970, by Robert Frazier. The state's case was exceedingly strong. The assistant manager of the Nite-Owl store in Brewer, Maine, testified that he was held up on the evening of September 16 by two men whom he identified in court as John Hanson and Robert Frazier. The latter held a pistol while Hanson collected the cash. Hanson, Frazier and Frazier's brother, Harley, were prosecution witnesses. Hanson and Frazier admitted to the robbery, and all three testified to substantially the following: They had met on the sixteenth at appellant Heald's house in Belfast, Maine. In company of Heald and his woman companion, they drove around in a car drinking. Robert Frazier and Heald discussed robbery, and Heald said he knew of a small place to rob, directing them to the Nite-Owl, which they drove by. Heald handed Robert Frazier a gun. They parked near but out of sight of the Nite-Owl, and Frazier and Hanson left the car, returning after having committed the robbery. While they were gone, the others including Heald waited inside the car. Later the robbers divided with Heald part of $385 seized from the store.

The defense concentrated on trying to undermine the credibility of the state's witnesses. No alibi or other evidence contradicting the state's version was later presented.

When the state rested, Heald moved for a judgment of acquittal on both indictments. Concerning the charge of accessory before the fact, Heald's counsel argued that if the state's evidence was believed, it showed that Heald was a

* Of the Second Circuit sitting by designation.

principal, not an accessory. A principal, Heald argued, could not be convicted under an indictment charging him as an accessory.

The court denied the motion, although for technical reasons not germane here it later dismissed Heald's indictment as an accessory after the fact. The case went to the jury on the remaining indictment; and the court, in its charge, accepted the defense theory that if Heald was, in fact, a principal he must be acquitted. The court explained at length to the jury the distinction between accessory and principal. It pointed out that an accomplice who is actually present at a crime is a principal, whereas an absent person who counsels or procures the commission of a crime is an accessory. Additionally, the court explained that an accomplice who is "constructively" but not actually present may be a principal. Under Maine law, as at common law, one standing by to render assistance (a lookout, for example) is constructively present, hence a principal. Heald, it was clear, was not actually present; but there was a question whether his proximity in the getaway car made him a principal because of constructive presence.

After the judge had explained these rather complicated rules, he told the jury that it must acquit Heald if it found him to be a principal.[1] The court then told the jury[2] that because of the peculiar nature of the case, it was to make special findings in the event of a not guilty verdict. The jury was to answer "Yes" or "No" to two written questions. The first was whether it found the defendant not guilty "only because he was constructively present at the scene of the crime." The second was whether its finding of innocence was "based upon the fact that the State failed to prove the elements of the crime of accessory

---

1. On appeal, the Maine Supreme Judicial Court characterized this instruction as "more favorable to the appellant than the law required." It ruled that one who has participated in an offense as a principal may, if the evidence warrants, be convicted as an accessory. State v. Heald, 307 A.2d 188, 197–198 (Me.1973).

2. "Now, because of the peculiar nature of this case, and it's only peculiar, I only say that, because I have been involved in this distinction between whether a person is a principal or an accessory, and as I have told you, if he is a principal, he cannot be convicted as an accessory. I am going to have the jury make some special findings, only in the event that there is a not guilty verdict. Your verdict ordinarily, Mr. Foreman, is returned orally. When you have completed your deliberations, you will notify the jury officer that you have so reached a verdict, and you will be returned to the courtroom. At that time the Clerk will ordinarily orally say to you, 'Mr. Foreman, has the jury agreed upon a verdict?', and you will respond, 'We have', and the Clerk will then say, 'Mr. Foreman, what say you, is the defendant at the Bar guilty of the offense as charged, or not guilty?', and then you would say 'Guilty' or 'Not guilty' as the case may be. In this case, in the event that there is a 'Not guilty' verdict, the Court is asking that a jury make an alternate finding,

because the Court must know whether or not—or what the jury's finding is with respect to whether you have found this defendant to be a principal or an accessory, or whether you have not found him to be there at all, or found that the proof is insufficient to warrant his conviction as an accessory. So you will have with you, Mr. Foreman, in the jury room two questions, and I will read it to you and you will examine it. 'If the verdict of the jury is "Not guilty", the jury will answer one of the following special findings: "We find the defendant not guilty only because he was constructively present at the scene of the crime".' In other words, the Court wishes to know whether or not the jury—or I should say, the Court wishes to know what the jury's finding is on the issue of whether he was constructively present or not constructively present, and that your decision of guilt or innocence was based—or your decision of innocence was based on that finding, or we want to know whether or not your decision of innocence was based upon the fact that the State failed to prove the elements of the crime of accessory before the fact beyond a reasonable doubt. So you will answer the appropriate question either 'Yes' or 'No', as the case may be, and then, Mr. Foreman, you will sign on the blank on the line provided for the Foreman's signature. This is all you will do, and this will be in addition to the returning of the verdict, as I have explained it to you."

before the fact beyond a reasonable doubt." These questions, appellant says, were constitutional error.

After the charge, Heald objected to "recording a verdict in special findings, a special verdict." The jury began its deliberations at 12:25, recessed for lunch from 12:35 to 2:05, and at 3:45 requested the judge to repeat his instructions as to principal and accessory. This was done, and the jury again retired at 4:12, returning at 4:20 with a guilty verdict.

Heald argues that any use of special verdicts and special questions in criminal cases is so alien to the Anglo-American tradition of trial by jury as to deny due process of law under the fourteenth amendment.[3] He says that to require a jury to particularize or explain its general verdict of "guilty" or "not guilty" must inevitably undermine its independence. The instant case is said to be especially bad because a special finding was required only in the event of a "not guilty" verdict. Heald concludes that once it has been shown that such "impermissible interference" has occurred an appellate court "cannot second-guess the jury to determine whether the error was 'harmless'".

Our review of appellant's habeas corpus petition is the "narrow one of due process, and not the broad exercise of supervisory power that we would possess in regard to our own trial court." DeChristoforo v. Donnelly, 473 F.2d 1236, 1238 (1st Cir. 1973), rev'd on other grounds, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). We must decide whether putting the special questions here—an action conceded to be error under Maine criminal procedures[4]—deprived Heald of "that fundamental fairness essential to the very concept of jus-

3. In Duncan v. Louisiana, 391 U.S. 145, 149, 194, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491, 522 (1968), the Court held that the fourteenth amendment guarantees to defendants in state cases "a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." Duncan does not, however, require a state to adopt every detail of federal jury practice. See, e. g., Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (approving state criminal jury of less than 12). It is those procedures necessary to the jury's essential purpose that appear to be constitutionally protected. The Williams Court said the purpose of the jury trial was

"to prevent oppression by the Government. 'Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.' . . . Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence."

399 U.S. at 100, 90 S.Ct. at 1905.

4. On appeal, the Supreme Judicial Court held that

"since neither judicial precedent, nor any Maine statute, nor the Maine Rules of Criminal Procedure so provides, . . . the use of special findings in criminal cases is not compatible with our traditional practice. . . . We conclude that it was error to require the jury to respond to the interrogatories in the event of a 'not guilty' verdict, but we hesitate to characterize the error as necessarily of constitutional dimension."

State v. Heald, supra note 1, 307 A.2d at 192. The Main court noted that while a few jurisdictions permit special questions in criminal cases, most jurisdictions disapprove, although seldom on constitutional grounds. After examining our decision in United States v. Spock, 416 F.2d 165 (1st Cir. 1969), the court concluded that special interrogatories do not violate constitutional guarantees of due process and trial by jury unless of the type designed "to lead the jurors down the guilty trail" so that the verdict becomes but a "'hollow affirmation' from jurors catechized by the questions they have been compelled to answer." State v. Heald, supra note 1, 307 A.2d at 193. Since these were not of that type and because the evidence of guilt was overwhelming, the court found no reason to reverse. Indeed, both the Supreme Judicial Court and the district court took the view that even if special questions amounted to constitutional error, the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

tice." Donnelly v. DeChristoforo, 416 U.S. at 642, 94 S.Ct. at 1871, *quoting* Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941). We think it did not.

This circuit's views on special questions in a federal criminal case are set forth in United States v. Spock, 416 F. 2d 165 (1st Cir. 1969). We held that there was a danger that such questions would "catechize" a reluctant juror away from an acquittal towards a seemingly more "logical" conviction. Yet

> "the jury, as the conscience of the community, must be permitted to look at more than logic. . . . If it were otherwise there would be no more reason why a verdict should not be directed against a defendant in a criminal case than in a civil one. The constitutional guarantees of due process and trial by jury require that a criminal defendant be afforded the full protection of a jury unfettered, directly or indirectly." *Id.* at 182.

*Spock* is in accord with general disapproval of special questions and verdicts in federal criminal cases. The third circuit wrote in 1946,

> "Special verdicts in criminal cases were not unknown at common law in England at the time of the adoption of our Constitution. . . . They have, however, become virtually unknown in federal criminal practice. . . . No provision for them is made in the Federal Rules of Criminal Procedure." United States v. Noble, 155 F.2d 315, 317 n. 4 (1946).

*See also* Gray v. United States, 174 F.2d 919 (8th Cir.), cert. denied, 338 U.S. 848, 70 S.Ct. 90, 94 L.Ed. 519 (1949); United States v. Adcock, 447 F.2d 1337 (2d Cir.), cert. denied, 404 U.S. 939, 92 S.Ct. 278, 30 L.Ed.2d 252 (1971); United States v. James, 432 F.2d 303 (5th Cir. 1970), cert. denied, 403 U.S. 906, 91 S.Ct. 2214, 29 L.Ed.2d 682 (1971); United States v. McCracken, 488 F.2d 406 (5th Cir. 1974).[5] The only circuit to express

a contrary view in recent years did so in dicta which may not reflect full consideration. Fuller v. United States, 132 U.S.App.D.C. 264, 407 F.2d 1199, 1231 n. 47 (1968). There is precedent, however, even within the federal judicial system for a limited use of special jury findings, usually in connection with sentence: a jury could be asked to determine whether the death penalty is to be imposed or whether the value of stolen property was more or less than $100. *See generally* 2 Wright, Federal Practice and Procedure § 512 (1969); *Spock, supra,* 416 F.2d at 182 n. 41.

The states generally decline to permit special verdicts and questions in criminal proceedings, although there are exceptions. *See, e. g.,* State v. Ellis, 262 N.C. 446, 137 S.E.2d 840 (1964) (separate verdicts on issues of paternity, non-support, and guilt utilized in criminal bastardy proceedings); Cal.Penal Code § 1150 et seq.

■ Viewed against this background we do not believe that a mechanical *per se* rule of unconstitutionality is warranted for all special questions in criminal cases. In *Spock* we were exercising our supervisory powers and, therefore, did not have to reach constitutional ground. 416 F.2d at 180. To be sure, *Spock* condemned special questions in terms of their effect upon the independence of juries, a ground going to the institutional integrity of juries and having plain constitutional implications. *See* note 3 *supra.* We have little doubt that, in general, the use of special questions and verdicts in any criminal proceeding, state or federal, is suspect not only as a matter of sound judicial policy but of due process as well.

We know, however, that special questions have been permitted for some very limited purposes even in federal criminal proceedings. We cannot say that every specialized use that may emerge under state procedures and statutes necessarily violates the due process clause. Some

---

5. The Supreme Court has never dealt with the issue conclusively. *See* Stein v. New

York, 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953).

usages may be exempt from the dangers described in *Spock*; for example, certain questions may plainly lack any capacity to catechize, color or coerce the jury's decision making.[6]

In any event, our function is not to draw global rules for all seasons but to examine the fairness and propriety of the actual procedures to which Heald was exposed. Upon doing so, we are satisfied that the two special questions were harmless and that Heald received a trial before an impartial jury whose independence was not placed in jeopardy.

It must be borne in mind that the two questions were merely designed to record whether an acquittal—had there been one—was based on the usual considerations (*viz.*, that guilt had not been proven), or whether it was based on a further defense-sponsored theory that if Heald was also a principal, he could not be convicted as an accessory. The latter theory was, it turned out, erroneous. *See* note 1 *supra*. Paradoxically, it made Heald's chances better the deeper his criminal involvement. By presenting that mistaken theory to the jury, the judge enlarged Heald's chances for acquittal, and it is difficult to see how the jury's consideration of questions designed only to distinguish between the alternate grounds of acquittal could have done him harm. Neither question called for an answer leading towards a verdict of guilt. The jury remained at all times free to acquit for the usual reasons; and the requirement that it label such an acquittal by saying "Yes" to the question whether the state had failed to prove its case, does not, in this context, seem a significant burden. There is no suggestion whatever that responding to the questions was ever meant by the judge to place any inhibitions upon the jury's right to acquit. To the contrary, the judge instructed at elaborate length on the jury's duties to acquit for failure of proof beyond a reasonable doubt, and the trial was conducted throughout with patience and conspicuous attention to the rights of the accused.

Nor are we impressed with the argument that acquittal-minded jurors may have voted to convict to avoid perplexity or disputes with fellow jurors over answering the questions. The relative brevity of their deliberation lends little weight to this speculation, and it can as well be argued that by having two strings to his bow, appellant received a windfall. Moreover, any confusion over the questions would be traceable to the introduction of an alternate theory of acquittal more generous than Heald deserved—one which Heald himself had promoted. It was Heald's own success in persuading the court to adopt this dubious theory that ultimately prompted the special questions. It seems inconceivable to us, as it did to the Maine Supreme Judicial Court and to the district court, that the two questions could have been so misinterpreted by jurors as to work a subtle infringement on their freedom to acquit for any reason, logical or illogical.

We therefore agree with the Maine Supreme Judicial Court that the trial court's erroneous use of special questions in the state criminal proceeding did not in these unique circumstances amount to a denial of due process or violate Heald's concomitant right to trial before an impartial jury. *Cf.* Cupp v. Naughten, 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

Affirmed.

---

6. *See, e. g.*, Jalbert v. United States, 375 F. 2d 125 (5th Cir. 1967) (asking jurors whether the value of stolen property was more or less than $100).