**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David Ray MAYES,
Defendant-Appellant.**

No. 74–3024.

United States Court of Appeals,
Ninth Circuit.

Oct. 6, 1975.

804

Walter Maund, San Diego, Cal., for defendant-appellant.

Harry D. Steward, U. S. Atty., San Diego, Cal., for plaintiff-appellee.

## OPINION

Before DUNIWAY, HUFSTEDLER and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

Mayes appeals from his conviction of illegal importation of marijuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1). His principal contentions are that evidence seized after an arrest without probable cause should have been suppressed and that there was insufficient evidence to support his conviction. We affirm.

### I. Finding the Cache of Marijuana

On March 11, 1974, two Border Patrol agents encountered Mayes walking north on Jewel Valley Road at 7:45 a.m. Jewel Valley Road is partly paved and runs south from Interstate 8 to the Mexican border; the portion nearer the border is dirt. The area is sparsely inhabited, consisting of rocky, brush-covered range. The agents encountered Mayes about one and one-half to two miles from the border. He looked to the agents as if he had spent the night in the brush. In response to questions from the agents, Mayes stated that he was a United States citizen and that he was coming from Mexico. He said that he had been

drinking in Tijuana the previous evening when he was robbed and left in the brush and that, when he awakened during the night, he walked north, crossing the border on foot. Because Tijuana is over 75 miles from the point of their encounter with Mayes, the agents had reason to and did doubt his story. Consequently, they arranged to have Mayes taken to the Border Patrol station at Campo, a few miles away, and detained there until they could backtrack his footsteps. (To backtrack is to follow tracks in the opposite direction from that in which the walker was proceeding.) The officers backtracked in a southerly direction toward the border. The persons who made the tracks had walked north.

The backtracking took about an hour and a half. The agents backtracked Mayes' boot prints from the point of their encounter south to the end of the pavement on Jewel Valley Road by following boot marks left in the dirt that had blown over the pavement and by checking to be sure that no boot marks indicated an entry on the road from the shoulder. At the end of the pavement, the agents found tracks in addition to those left by Mayes. The agents had examined Mayes' boots and had found a distinctive tread with which the agents were familiar. A pair of boots with similar tread, and a diagram of the tread, were shown to the jury. None of the other tracks found by the agents were similar.

The new tracks did not lead anywhere but gave the appearance of people getting out of a car, walking around and getting back in the car. There were many prints from all three tracks in the area. There were also tire markings. The agents backtracked Mayes' tracks along the dirt continuation of Jewel Valley Road and then off the road. About 100 yards from the road, Mayes' tracks intersected and mingled with two further sets of tracks. These tracks were also quite different from Mayes' tracks. One agent traced Mayes' tracks from this point to a cache of 110 pounds of marijuana in a crevice between two boulders on the ground. The other agent followed the new tracks up a hillside, where there was evidence of milling around, and then down to the area around the cache where they rejoined Mayes' tracks. From the cache, the agents backtracked Mayes' tracks and the new tracks south for a short distance. Mayes' tracks separated from the other tracks south of the cache but all tracks came from the direction of the border.

The cache was located about one mile north of the border and about one-half mile from the end of the pavement. The agents testified that Mayes left good tracks, although the terrain near the cache was rough and rocky. The marijuana in the cache consisted of 50 one-kilo bricks, wrapped in cellophane and packed into one backpack and three Mexican flour sacks, one separate and two others tied together. Such sacks are often used in smuggling. From these facts the agents could reasonably conclude that three persons had brought the marijuana from the border and hidden it. They could also reasonably conclude that each had carried part of the load—one a backpack, one a single flour sack and one the two sacks that were tied together. They could also reasonably conclude that Mayes was one of the three.

## II. Discovery of the Marijuana Debris

After finding the marijuana cache, the unclear record suggests that the agents went either to the Border Patrol station at Campo or to the office of the Drug Enforcement Administration (DEA) at Tecate. There is testimony that DEA agents placed Mayes under arrest at Campo; but there is also testimony that this was done at Tecate. There is no direct testimony that, before the arrest, the arresting agents knew of the discovery of the marijuana cache or had been told to make the arrest by agents who did know of it. The record does show that the marijuana from the cache, in its containers, was delivered to the DEA agents, apparently at Tecate, and

placed in a special room where such evidence is kept.[1] The DEA agents also searched Mayes and found marijuana sweepings in his pockets or elsewhere in his clothing.

### III. *The Motion to Suppress*

Mayes' counsel asked the trial judge to suppress both the marijuana that was found in the desert cache and the marijuana sweepings that were found in Mayes' clothing when he was searched. It is not entirely clear from his brief whether he now claims error in each denial or only in the refusal to suppress the sweepings but we will consider both.

■ We have no doubt that the time, place and circumstances being what they were, it was proper for the agents to stop and question Mayes. If his answers had raised no further suspicions, they should not have detained him. *See United States v. Jennings,* 468 F.2d 111 (9th Cir. 1972). But Mayes' statements increased their suspicions. His answers to their questions gave them cause to believe that he had crossed the border illegally. His explanation of how he got to where the agents were was, to say the least, improbable. There was one obvious way to check out his story— by backtracking. This the agents did. Meanwhile, they had Mayes held until the backtracking could be completed. Mayes contends that this detention was illegal; therefore the cache of marijuana should be suppressed. We are not convinced that, under the circumstances, the detention was unreasonable. *See United States v. Richards,* 500 F.2d 1025, 1029 (9th Cir. 1974), *cert. denied,* 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975). But we need not decide the question because, even if the detention was unconstitutional, it was unrelated to the discovery of the cache. No evidence gained during Mayes' detention led to the cache of marijuana. The only evidence from Mayes that they relied upon was the shape of his boot print and his improbable story that he was robbed in Tijuana. Both were obtained during the short time—approximately five minutes—that he was questioned at Jewel Valley Road. Detention for this brief time undoubtedly was justified by Mayes' improbable account of being robbed in Tijuana, *Terry v. Ohio,* 392 U.S. 1, 20–23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Wilson v. Porter,* 361 F.2d 412, 415 (9th Cir. 1966). We conclude that the cache of marijuana was discovered without reliance upon any allegedly illegal police conduct. This discovery produced probable cause for an arrest of Mayes.

The only argument for taint of the cache seizure is that the detention, until discovery of the marijuana cache, eliminated the opportunity for Mayes, intentionally or otherwise, to avoid arrest. We reject this argument as without reason or legal authority.

■ We need not reach the question whether the marijuana sweepings should have been suppressed as the fruit of any illegal detention. In comparison with the marijuana cache with which Mayes was found to be criminally associated, the marijuana debris was infinitesimal. Any error would be harmless beyond a reasonable doubt. *Chapman v. United States,* 386 U.S. 18, 21–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Thus we need not consider the legality of the detention.

### IV. *Sufficiency of the Evidence*

■ The second ground for reversal put forward by Mayes is that there was

---

1. One of the DEA agents testified that after the search was completed, he placed packets containing the sweepings from Mayes' clothing "with the contraband in a seizure locker." Earlier testimony of the same agent suggests that the contraband referred to in this statement is the marijuana found at the cache.

The testimony of the Border Patrol agents also supports the conclusion that the search was conducted after the cache was discovered. They testified that they instructed other Border Patrol agents to detain Mayes at the Border Patrol station at Campo until they finished backtracking. Mayes was not searched until he was transferred to the custody of DEA agents.

insufficient evidence to support a conviction. There are three elements of the offense for which Mayes was convicted: (1) knowing or intentional (2) importation (3) of marijuana. 21 U.S.C. §§ 960(a)(1), 952(a). However, the evidence need not show that Mayes himself committed each element of the offense, but only that he aided and abetted in a scheme to do so. 18 U.S.C. § 2(a); *Nye & Nissen v. United States,* 336 U.S. 613, 618–20, 69 S.Ct. 766, 93 L.Ed. 919 (1949); *United States v. Sannicandro,* 434 F.2d 321, 323–24 (9th Cir. 1970). The record reveals that the judge, the trier of fact in this case, was aware that Mayes could be convicted on this theory. The Supreme Court has defined aiding and abetting as follows:

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." L. Hand, J., in *United States v. Peoni,* 2 Cir., 100 F.2d 401, 402.

*Nye & Nissen v. United States, supra,* 336 U.S. at 619, 69 S.Ct. at 769; *accord, Ramirez v. United States,* 363 F.2d 33, 34–35 (9th Cir. 1966). Hence, the question before us is whether, construing the evidence most favorably to the government, there is substantial evidence that Mayes participated in a scheme to import marijuana knowingly or intentionally. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed.2d 680 (1942).

 The existence of a scheme to import marijuana cannot be doubted. The cache of 110 pounds of marijuana was found hidden, approximately one mile from the border in Mexican flour sacks and a backpack, containers commonly used by smugglers. The only

doubt relates to Mayes' connection with that illegal venture. The judge could properly infer that Mayes was one of the persons who smuggled the marijuana into the country.

Because we must construe the evidence most favorably to the government, we must credit the uncontradicted testimony of the Border Patrol agents that they could and did backtrack Mayes' boot prints from the point of their encounter with him back to the marijuana cache and thence toward the border. Mayes himself admitted crossing the border. There is no evidence that the additional tracks encountered were similar to those of Mayes; indeed the other tracks were entirely different. The agents found the tracks of Mayes and of two others near the cache. They found that the tracks of Mayes came to the cache from the direction of the border. They also found the three tracks one-half mile from the cache near a dirt road, where they were mixed in with each other. It may be inferred that Mayes met and spoke with the two others near the dirt road. The tracks at the cache permit the inference either that some or all of the three brought the marijuana across the border or that someone else had done so and then informed them of the location of the cache. It is too great a coincidence that the tracks of all three joined together near the cache and that Mayes' tracks led right up to it. From the fact that the three knew of the cache and were present at the cache, the most probable inference is that they assisted in bringing the marijuana across the border or that they acted to move it from the cache further into the United States.[2] In either case, Mayes purposely associated himself with a scheme to smuggle marijuana.

The only innocuous explanation of the evidence is that Mayes innocently came

2. We do not imply that knowledge of illegal activity coupled with presence at the scene of the crime always supports an inference of guilt. The sufficiency of the inference depends upon the facts of each case, especially the nature of the crime and the locale in which it was committed. *Compare United States v. Romano,* 382 U.S. 136, 139–40, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965), *and United States v. Gainey,* 380 U.S. 63, 66–68, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965), *with Ramirez v. United States,* 363 F.2d 33, 34–35 (9th Cir. 1966).

upon the cache and was later accosted by two smugglers standing watch over it. This explanation is discredited, however, by Mayes' implausible statement to the Border Patrol agents that he had been robbed in Tijuana the previous night and then driven at least 60 miles to be left in the wilderness. The remote possibility that Mayes may have happened innocently upon the marijuana does not render the evidence to the contrary insubstantial. The remaining issues raised by Mayes do not warrant specific comment.

Affirmed.