UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael O'LOONEY,
Defendant-Appellant.

No. 75–2666.

United States Court of Appeals,
Ninth Circuit.

Aug. 31, 1976.

Certiorari Denied Dec. 13, 1976.
See 97 S.Ct. 692.

Seligman, *An Exception to the Hearsay Rule*, 26 Harv.L.Rev. 146 (1912).

David P. Schippers (argued), Chicago, Ill., for defendant-appellant.

Bruce R. Castetter, Asst. U. S. Atty., San Diego, Cal. (argued), Terry J. Knoepp, U. S. Atty., Bruce R. Castetter, Asst. U. S. Atty., San Diego, Cal., on the brief, for plaintiff-appellee.

Before HUFSTEDLER and WALLACE, Circuit Judges, and SMITH,* District Judge.

WALLACE, Circuit Judge:

O'Looney was involved in an alleged plot to export guns illegally to Ireland for use by the Irish Republican Army. He was indicted on five counts. One count was for conspiring to engage in the business of exporting arms without registering with the State Department and conspiring to make a false statement with respect to the information required to be kept in the records of a federally licensed firearms dealer, all in violation of 18 U.S.C. §§ 371 and 924(a) and 22 U.S.C. § 1934. The other four counts were for aiding and abetting the making of false statements in violation of 18 U.S.C. §§ 2 and 924(a). O'Looney was convicted by a jury on the part of the first count charging a conspiracy to engage in the business of exporting arms and acquitted of all other counts. We affirm.

O'Looney was born and raised in Ireland. He had lived in the United States for over 20 years and had been a naturalized citizen for about five years. He became interested in the movement to reunify Ireland. After a trip to his homeland, he agreed with co-defendant Harper [1] to purchase weapons for the cause. O'Looney furnished the money and Harper, at times using false identification, purchased the weapons. At the time the plot first came to the attention of police, Harper had purchased at least six semi-automatic rifles at five different stores in the San Diego area and had paid a deposit on a seventh.

On appeal, O'Looney claims that evidence and statements obtained in violation of his Fourth and Fifth Amendment rights should have been suppressed, that the evidence was insufficient to support his conviction and that he was prejudiced by use of a special verdict form.

I.   The Auto Search

On one of their gun-purchasing ventures, Harper's unusual behavior aroused the suspicion of the gun store owner. After Harper left the store he was observed talking to O'Looney. Harper returned to the store to place a cash deposit on a semi-automatic rifle and produced identification containing what the owner believed to be a false address. The owner sent a letter to Harper at that address; it was returned marked "no such address." Harper returned to the store about a week later to pick up the rifle he ordered. The owner called the police and the first officer to arrive questioned Harper and the owner. The owner directed the second officer, a policewoman, to a neighbor who had been keeping an eye on O'Looney. The neighbor pointed out O'Looney, walking along the sidewalk. O'Looney produced identification upon request and denied knowing the man in the

---

* Honorable Russell E. Smith, United States District Judge, District of Montana, sitting by designation.

1.   Several months before O'Looney's trial, Harper pleaded guilty and his case was severed from O'Looney's.

store (Harper). He stated that he had a car a few blocks away and agreed to go there in a police car. He also agreed to allow his car to be searched and signed a statement to that effect. The search produced evidence connecting O'Looney with Harper and prompted the police to investigate further.

There is no doubt but that the policewoman properly detained O'Looney for the initial inquiry. The attempted purchase of firearms with false identification was a crime, 18 U.S.C. § 922(a)(6), and O'Looney had been identified as a possible accomplice. There was thus reasonable suspicion to support the preliminary investigation. *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 21–23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

O'Looney claims that the search was illegal, however, because it was made without a warrant. The government responds that O'Looney voluntarily consented to the search. This is a question of fact, *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), upon which the government had the burden of proof by a preponderance of the evidence. *See United States v. Matlock,* 415 U.S. 164, 177–78 & n.14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Lego v. Twomey,* 404 U.S. 477, 488–89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The trial judge found that the government met this burden. We will reverse such a finding only if in viewing the evidence in the light most favorable to the government, *United States v. Sherman,* 430 F.2d 1402, 1404 (9th Cir. 1970), *cert. denied,* 401 U.S. 908, 91 S.Ct. 865, 27 L.Ed.2d 805 (1971), we conclude that it is clearly erroneous, *United States v. Rothman,* 492 F.2d 1260, 1264 (9th Cir. 1973); *United States v. Page,* 302 F.2d 81, 85 (9th Cir. 1962) (en banc).

We cannot conclude that the trial court's finding was clearly erroneous. The Supreme Court has noted that there is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 224, 93 S.Ct. at 2046. Instead, the Court has stated that the issue is one "of fact to be determined from all the circumstances." *Id.* at 248–49, 93 S.Ct. at 2059.

O'Looney submitted an affidavit alleging that he consented only because he was in custody, frightened and totally out of his element and because he was misled into believing that he must consent to allay police suspicion. However, the evidence was to the contrary. O'Looney was not especially vulnerable to coercion because of youth, lack of education or low intelligence. *See, e. g., Payne v. Arkansas,* 356 U.S. 560, 562 & n.4, 567, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); *Fikes v. Alabama,* 352 U.S. 191, 193, 197–98, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); *Haley v. Ohio,* 332 U.S. 596, 599–600, 68 S.Ct. 302, 92 L.Ed. 224 (1948). It appears that he was a sophisticated businessman with interests in California, Illinois and Ireland and that he had often sought legal advice in business affairs. Indeed he had consulted his attorney about the legality of the arms purchasing scheme itself.

Nor was O'Looney subjected to a lengthy detention, prolonged interrogation or physical punishment. *See, e. g., Ashcraft v. Tennessee,* 322 U.S. 143, 153–54, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); *Chambers v. Florida,* 309 U.S. 227, 239, 60 S.Ct. 472, 84 L.Ed. 716 (1940); *Brown v. Mississippi,* 297 U.S. 278, 281–83, 56 S.Ct. 461, 80 L.Ed. 682 (1936). O'Looney agreed to take the police to his car after only a few minutes of questioning on a public sidewalk. There were no drawn weapons, no evidence of handcuffs, no overt force and no threats. The trial judge found that the policewoman who obtained O'Looney's consent was not "an overpowering woman and would [not] have scared Mr. O'Looney into doing anything he didn't voluntarily want to do." O'Looney makes much of the fact that he was locked in the back of the police car for the short ride from the gun store to the car and during the search. He agreed to ride in the police car, however, while standing on the sidewalk. He was also out of the car and on the sidewalk when he agreed to the search.

Although the police did not specifically tell O'Looney of his right to refuse consent, they were not required to do so. *Schneckloth v. Bustamonte, supra.* O'Looney was not misled by the police into believing he had no such right. *See, e. g., Bumper v. North Carolina,* 391 U.S. 543, 548–50, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

We conclude from the totality of the circumstances that the trial court's finding of voluntary consent is not clearly erroneous. In fact, it appears that O'Looney freely consented to the search in a voluntary effort to allay police suspicion. Indeed, O'Looney's attorney argued to the jury that O'Looney "freely and fully signed a consent, and permitted them to search his car."

## II. The Statement

The car search produced evidence that O'Looney was connected with Harper. He was transported to the San Diego Police Station where, after *Miranda* warnings were given, he again denied he knew Harper. Federal Alcohol, Tobacco & Firearms (ATF) agents had been called. When they arrived, they again gave O'Looney his *Miranda* warnings and he then signed a statement in which he swore that he and Harper had decided to obtain guns for Ireland.

■ O'Looney first contends that the statement was involuntary. The government must demonstrate voluntariness by a preponderance of the evidence. *Lego v. Twomey, supra,* 404 U.S. at 488–89, 92 S.Ct. 619; *United States v. Cluchette,* 465 F.2d 749, 754 (9th Cir. 1972). The district court found the statement voluntary and admissible. We cannot reverse that finding in the absence of clear error. *Id.* at 754. We find no clear error here.

As pointed out earlier, O'Looney was a sophisticated businessman and had a regular attorney whom he had previously consulted about his rights. Full *Miranda* warnings were given twice, yet O'Looney without hesitation waived his rights to silence and the presence of his attorney. He was not subject to lengthy interrogation. He was not questioned on the way to the police station from the gun store. When he arrived at the station, a detective informed him of his rights and questioned him for ten to fifteen minutes about his connection with Harper and their reasons for purchasing guns. The detective later talked to him for five or ten minutes more. Then, satisfied that no violation of local law had been committed, he placed O'Looney in an interrogation room to await the arrival of ATF agents. Within an hour after the agents' arrival, O'Looney had given a complete statement, waited for it to be written up and signed it. We find nothing in the record to suggest clear error in the trial judge's finding that the statement was voluntary.

■ O'Looney's second contention is that the statement was the product of an illegal detention or arrest and therefore should have been suppressed under *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). We reject this contention. As earlier indicated, the initial stop of O'Looney was supported by reasonable suspicion and was thus reasonable under the Fourth Amendment. He argues that after he was taken to the police station, the continued investigatory detention was unreasonable and the statement which, he argues, was the product of that detention, should have been suppressed. We disagree.

The continued investigatory detention of O'Looney was reasonable under the circumstances. The police had reason to believe O'Looney was connected with Harper's attempted illegal purchase. Their curiosity was aroused by the secrecy and intrigue surrounding the purchase of an otherwise legal weapon. They suspected that more was involved than a simple purchase with false identification; they thought O'Looney and Harper might be purchasing the firearm for an illegal purpose. It was not unreasonable to detain O'Looney temporarily at the station to await the arrival of federal officers who are more familiar with the federal firearms laws and more experienced in their enforcement. *Cf. United States v. Mayes,* 524 F.2d 803, 806 (9th Cir. 1975); *United States v. Richards,* 500 F.2d

1025, 1028–29 (9th Cir. 1974), *cert. denied,* 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975).

■ Moreover, we think the police had probable cause to arrest O'Looney even though he was not officially placed under arrest that day. At the time he was taken to the station, the police knew of Harper's crime, the positive connection between Harper and O'Looney from the automobile search and that O'Looney had lied about knowing Harper. This was an adequate showing of probable cause. Since an arrest would have been reasonable, the temporary investigatory detention was also reasonable.

Finally, even if there were an illegal detention, the statement need not be suppressed. *Brown v. Illinois, supra,* relied upon by O'Looney, held that the giving of *Miranda* warnings did not sufficiently attenuate the taint of an illegal arrest so as to render ensuing inculpatory statements admissible. But *Brown* does not purport to establish a per se rule that any statement following an illegal arrest is tainted. The Court instead reaffirmed the rule of *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), that such a statement is admissible if it is "sufficiently an act of free will to purge the primary taint. . . ." 422 U.S. at 602, 95 S.Ct. at 2259 (quoting *Wong Sun*). The Court said that this question "must be answered on the facts of each case. No single fact is dispositive." *Id.* at 603, 95 S.Ct. at 2261. The Court noted that the giving of *Miranda* warnings is an important factor. Also important are the temporal proximity of the arrest and statement, the existence of intervening circumstances and particularly the purpose and flagrancy of the official misconduct. *Id.* at 603–04, 95 S.Ct. 2254.

2. This time span differs significantly from that in *Wong Sun,* where Toy's statement was made immediately after six or seven federal agents illegally broke open his door and chased him into his bedroom where his wife and child were sleeping. 371 U.S. at 474, 486, 83 S.Ct. 407. *But see Brown v. Illinois, supra,* 422 U.S. at 604, 95 S.Ct. 2254.

■ Examining each of these factors, we conclude that O'Looney's statement is not tainted by the seizure of his person, even if we assume it was illegally accomplished. The Supreme Court in *Brown* placed the greatest emphasis on the flagrancy of the Fourth Amendment violation. There, the police broke into and searched the defendant's apartment without a warrant. Upon the defendant's return home, he was arrested at gunpoint, also without a warrant. The police had no more basis for these acts than that the defendant was an acquaintance of a murder victim. *Id.* at 592–93, 95 S.Ct. 2254. Here, at the very least, the police had a well-founded reasonable suspicion approaching probable cause to believe that O'Looney had committed a crime. There were neither drawn guns nor police actions calculated to cause surprise, fear and confusion. The detention was no more extensive than reasonably necessary to facilitate a brief inquiry into an apparent crime. Thus we need not be concerned with deterring purposefully illegal arrests for investigatory or other improper motives. *Id.* at 599–600, 95 S.Ct. 2254, *id.* at 610–12, 95 S.Ct. 2254 (Powell, J., concurring in part).

In comparison with *Brown,* the detention of O'Looney was at worst a minor violation of the Fourth Amendment. It was relatively nonintrusive on his personal privacy. He was originally detained on a public sidewalk and he voluntarily cooperated with officers in an effort to allay police suspicion, unlike the forcible seizure of Brown by surprise at his home. Where the Fourth Amendment violation is less flagrant, a lesser showing is required to purge the later statement of taint. Here we hold that O'Looney's statement following the giving of *Miranda* warnings several hours after the initial detention [2] was sufficiently an act of free will

Indeed, the temporal interlude in O'Looney's case is of a sufficiently different nature as to warrant characterizing it as an intervening circumstance of significance. O'Looney waited in an interrogation room for over an hour after the initial questioning by the local detective before the ATF agents arrived. He was not questioned at all during this time and was free to reflect on the situation or to call his attor-

outside the causal chain of the alleged illegal detention.[3] To hold otherwise would be to invoke the Fourth Amendment exclusionary rule for a de minimis deterrent effect on errant police behavior, at a great cost to the legitimate demands of law enforcement. *See id.* at 602–03, 95 S.Ct. 2254, *id.* at 608–12, 95 S.Ct. 2254, (Powell, J., concurring in part).

### III. The House Search

■ After giving his first statement at the station, O'Looney agreed to take the ATF agents to his house in Del Mar and allow it to be searched. Two weapons purchased by Harper were found and introduced into evidence at the trial. The district judge found that O'Looney's consent was voluntary. This finding also was not clearly erroneous.

### IV. Sufficiency of the Evidence

■ O'Looney contends that there was no evidence that he and Harper exported or conspired to export any weapons. Thus he argues that the government has failed to prove a conspiracy to violate 22 U.S.C. § 1934. Viewing the evidence in the light most favorable to the government, *United States v. Hood,* 493 F.2d 677, 680 (9th Cir.), *cert. denied,* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974), it is clear to us that the evidence supports the verdict.

O'Looney was deeply involved with the Irish unification movement and he had provided funds to purchase weapons. There is a substantial amount of circumstantial evidence that he intended the arms to be exported to Ireland and his two statements to federal officers are specific direct evidence on the issue. In the first statement, he admitted furnishing funds to Harper to obtain "armaments for the movement in Ireland." In the second statement in the presence of his attorney, he stated that he and Harper decided to get guns for Ireland. When O'Looney took the stand, he testified that he thought the guns were for the American Irish Republican Army and that he was not aware that the ultimate destination of the guns was Ireland. The jury had a right to disbelieve him and, with the additional facts in this case pointing to a contrary conclusion, could consider that disbelief as positive evidence of the opposite to which he testified. *United States v. Hood, supra,* 493 F.2d at 680; *United States v. Cisneros,* 448 F.2d 298, 305–06 (9th Cir. 1971).

### V. The Special Verdict

The first count of the indictment charged a conspiracy with two objects: (1) exporting arms and (2) using false documents. During its deliberations, the jury sent the court a note indicating some difficulty with this count.[4] As the court attempted to answer the jury's question, it became clear that the question resulted from a disparity between the indictment and the verdict form. The indictment charged a conspiracy to export "and" to falsify. The verdict form substituted "or" for "and." The substitution was proper since the jury was required only to agree that a conspiracy existed as to one of the unlawful objects charged in order to convict O'Looney on Count One. *See United States v. Friedman,* 445 F.2d 1076, 1083–84 (9th Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). But some jurors appeared to be confused even after the judge explained this point. To eliminate this confusion, it was suggested that the verdict form be retyped to allow the jury to find

---

ney. Whereas O'Looney had been evasive in answering the detective's questions concerning his connection with Harper and their purpose in purchasing the rifle, as soon as the ATF agents arrived, he discussed these matters openly and in some detail.

**3.** We think it significant that subsequent to his release, O'Looney returned with his attorney and made substantially the same statement as the one he now claims to be involuntary.

**4.** The jury's note stated:

> There is a dispute on Count One, because it lists two different charges. Many of us feel definite about one part, but not about another. Our question: If we feel guilty or not guilty on one part, does that mean that the whole count must then follow suit? Please, again, define conspiracy.

O'Looney guilty or not guilty of conspiracy for each of the two separate objects charged. Both attorneys agreed to this procedure. The jury then returned a verdict of guilty of conspiracy to export firearms and not guilty of conspiracy to falsify records.

■■■ Although there was no objection at trial, O'Looney now argues that he was irrevocably prejudiced by this procedure. We do not find any plain error requiring reversal. As a rule, special verdicts in criminal cases are not favored. *See United States v. Spock,* 416 F.2d 165, 180–83 (1st Cir. 1969). There is no per se rule, however, that such verdicts are absolutely forbidden. *See Heald v. Mullaney,* 505 F.2d 1241, 1245 (1st Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975). Nor do we agree with O'Looney that the trial court lacked power to accept the special verdict form adopted here. *See United States v. Ogull,* 149 F.Supp. 272, 275–78 (S.D.N.Y.1957), *aff'd sub nom. United States v. Gernie,* 252 F.2d 664 (2d Cir.), *cert. denied,* 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958). Thus we must focus on the particular circumstances of this case. *Heald v. Mullaney, supra,* 505 F.2d at 1246.

Most criticism of special verdicts in criminal cases is based on the danger that such verdicts might be devices for bringing judicial pressure to bear on juries in reaching their verdicts. Such criticism has been summarized:

> To ask the jury special questions might be said to infringe on its power to deliberate free from legal fetters; on its power to arrive at a general verdict without having to support it by reasons or by a report of its deliberations; and on its power to follow or not to follow the in-

structions of the court. Moreover any abridgment or modification of this institution would partly restrict its historic function, that of tempering rules of law by common sense brought to bear upon the facts of a specific case.

*United States v. Ogull, supra,* 149 F.Supp. at 276 (footnotes omitted).

■■■ But none of of these dangers are present in the circumstances presented by this case. All the cases cited by O'Looney involved impositions of special verdicts on the juries, over the defendants' objections, at the outset of the juries' deliberations. Here, the judge did not impose the special verdict and O'Looney did not object.[5] The jury had deliberated for some time before asking for clarification of Count One. Even after the judge explained that they could find O'Looney guilty of the first count even if they found a conspiracy for only one of the two objects charged, one juror expressed confusion that "there is only one place to sign either guilty or not guilty . . .." The judge took this as a request for a different verdict form and, with the approval of both attorneys, had the form retyped.

We do not see how O'Looney could have been prejudiced by this procedure. There is no suggestion that if the form had not been changed, the jury would have disregarded the judge's instruction and found O'Looney not guilty on the first count. We see no indication that judicial pressure was brought to bear on the jury and certainly not enough to constitute plain error; indeed, O'Looney received a fair trial. *See United States v. Jeffery,* 473 F.2d 268, 271 (9th Cir.), *cert. denied,* 414 U.S. 818, 94 S.Ct. 42, 38 L.Ed.2d 51 (1973); *Herzog v. United States,* 235 F.2d 664, 666 (9th Cir.) (en

---

**5.** O'Looney argues that his counsel approved this procedure without consulting him and that his counsel's failure to object is therefore not a waiver under the strict standard of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1968). That case, however, and its requirement that the accused himself consciously surrender a known right, is applicable only to certain fundamental rights, and not to strategic and tactical decisions, even if there are consti-

tutional implications. *Estelle v. Williams,* 425 U.S. 501, 508–509, 96 S.Ct. 1691, 1695, 48 L.Ed.2d 126 n. 3 (1976); *United States v. Indiviglio,* 352 F.2d 276, 280 (2d Cir. 1965) (en banc), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). In the circumstances of this case, O'Looney had no constitutional right to a general verdict. The rule of *Johnson v. Zerbst* is therefore inapplicable.

banc), *cert. denied,* 352 U.S. 844, 77 S.Ct. 54, 1 L.Ed.2d 59 (1956).

AFFIRMED.

HUFSTEDLER, Circuit Judge (dissenting in part):

I dissent from that portion of the majority opinion stating that O'Looney's statement need not be suppressed even if his detention was illegal. I agreed that his detention was not illegal, and the whole discussion is unnecessary to the decision. Upon the majority's assumed premise of illegality, I could not brush off the violation of the Fourth Amendment as *de minimis* nor could I agree that O'Looney's acts and statement were either voluntary or purged from illegal taint. Illegal detention for hours in the coercive atmosphere of a police station is not lightly to be overlooked.