**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Caron FAHERTY, Defendant-Appellant.**

No. 82–1130.

United States Court of Appeals,
Ninth Circuit.

Submitted July 13, 1982.

Decided Nov. 22, 1982.

Doron Weinberg, Larson, Weinberg & Harris, San Francisco, Cal., for defendant-appellant.

Joan S. Brennan, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Appeal from the United States District Court for the Northern District of California.

Before KENNEDY and SKOPIL, Circuit Judges, and BURNS,* District Judge.

SKOPIL, Circuit Judge:

## INTRODUCTION

Faherty was convicted of violating 21 U.S.C. § 952(a), importation of heroin, and 21 U.S.C. § 844, possession of heroin, following trial to the court on stipulated facts. On Count I, importation of heroin, Faherty was sentenced to a five year term of custody, receiving a mandatory special parole term of three years. Execution of the sentence was suspended conditioned on three years probation and 120 days confinement in a jail-type institution. On Count II, the imposition of sentence was suspended with appellant placed on three year probation concurrent with Count I.

On December 15, 1981 we remanded to the district court with instructions to hold a post-conviction hearing to determine whether Faherty voluntarily consented to an x-ray search. *United States v. Faherty*, No. 81–1253. The district court held an evidentiary hearing, entered findings of fact and the case has been returned for disposition.

## FACTS

During the primary inspection, a customs inspector ascertained that Faherty was returning from a source country (Thailand), was self-employed and was overly friendly and helpful. Faherty was escorted to a secondary search area for a more intensive examination. Her demeanor was calm but she exhibited restricted movements.

The baggage search revealed a notebook with various names, including that of Tom Hubbard. A check of Tom Hubbard disclosed that he was involved in drug smuggling. Drug Enforcement Administration records revealed that Faherty had been called by a person under investigation by that agency.

An interview with Faherty disclosed that she was self-employed, she did not have any business cards to substantiate her employment, she traveled to Thailand with a couple named Fossi who returned alone, she spent three weeks in Thailand vacationing, she purchased a ticket through a travel agent in Chicago, her travel arrangements necessitated a night in San Francisco, and she was chilled and sleepy.

A strip search was conducted. The search was negative. Customs agents informed Faherty that they believed she was concealing something in her body and requested that she consent to an x-ray search. Faherty refused. She was advised that a request for a court order would be prepared and she would be detained until the request was presented to the court.

---

* The Honorable James M. Burns, Chief Judge, United States District Court for the District of Oregon, sitting by designation.

In discussing the case with an Assistant United States Attorney, a customs agent informed him that Faherty had consented to the x-ray examination. Faherty was escorted to the San Francisco Airport Medical Clinic, where she signed a consent form. An x-ray revealed a foreign object in her body. At the hospital Faherty expelled a balloon containing heroin. Approximately six hours expired from the time of the initial primary search to the time she expelled the balloon containing heroin.

## ISSUES

1. Was Faherty's strip search based on "real suspicion" supported by objective, articulable facts?

2. Was Faherty's detention following an unproductive strip search illegal?

3. Was Faherty's consent to the x-ray examination voluntary?

4. Was the imposition of a special parole term permissible where imprisonment was suspended and probation imposed?

## ANALYSIS

1. Was Faherty's strip search based on "real suspicion" supported by objective, articulable facts?

The standard of "real suspicion" applicable to Faherty's strip search first was articulated in *Henderson v. United States,* 390 F.2d 805 (9th Cir.1967). It was later defined in *United States v. Guadalupe-Garza,* 421 F.2d 876, 879 (9th Cir.1970), where we stated:

"Real suspicion" justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States."

██ The suspicion must be supported by objective, articulable facts known to the agent at the time of the search. The suspicion need not be correct. *United States v. Cameron,* 538 F.2d 254 (9th Cir.1976).

██ In the present case, the agent's initial suspicion was triggered by Faherty's arrival from a source country, self-employed and an overly friendly attitude. Subsequent investigation revealed: restricted movements, an inability to substantiate her employment, the name "Tom Hubbard" in Faherty's notebook, a call placed to her phone by an undisclosed drug suspect, chilling and drowziness, and unusual travel arrangements.

The facts known to the agent who ordered the strip search are sufficient to meet the standard of "real suspicion".

2. Was Faherty's detention following an unproductive strip search illegal?

██ Faherty's contention that the six hour detention was illegal has been decided by this court in *United States v. Ek,* 676 F.2d 379 (9th Cir.1982). The fourth amendment does not require a warrant or probable cause for customs searches at the border. See *United States v. Moore,* 638 F.2d 1171, 1173 (9th Cir.1980). Neither a warrant or probable cause is needed to detain a person for a search at the border so long as the period of detention does not exceed what is reasonably necessary to conduct a valid search. In *United States v. Ek,* 676 F.2d at 382, this court specifically held that a 10–12 hour detention was not unreasonable absent a showing that the government intentionally delayed obtaining the order. There is no evidence to suggest that the government did not move as expeditiously as possible. The continued detention of Faherty for the purpose of obtaining a court order authorizing an x-ray search was not illegal.

3. Was Faherty's consent to the x-ray examination voluntary?

██ A finding by a trial court of voluntary consent should be reversed only if, after viewing the evidence in the light most favorable to the government, an appellate court concludes that the lower court was clearly erroneous. *United States v. O'Looney,* 544 F.2d 385 (9th Cir.), *cert. denied,* 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976); *United States v. Lemon,* 550 F.2d

467 (9th Cir.1977). After the post-conviction hearing the trial court specifically found that the consent to the x-ray examination was voluntary.

The standard for measuring voluntariness of consent to a search was set forth by the Supreme Court in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973): "The question whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.

██ The colloquy between Faherty and the court indicates that Faherty understood that her consent or a court order was required for the x-ray examination, that she would be detained during the time an order was requested, that the United States Attorney's Office was in the process of preparing a request for a court order, that in all likelihood the court order would be forthcoming, and that she would be required to sign a medical consent form before the x-ray examination was performed. Based on this information, Faherty indicated "let's go—let's get it over with." Subsequently, approximately an hour later, Faherty was escorted to the San Francisco Airport Medical Clinic where she signed a consent form authorizing the x-ray examination.

In view of the record we cannot say that the court was clearly erroneous in its finding that Faherty voluntarily consented to the x-ray examination.

4. Was the imposition of a special parole term permissible where imprisonment was suspended and probation imposed?

██ Faherty was sentenced to a five year imprisonment term under 21 U.S.C. § 960 which provides: "If a sentence under this paragraph provides for imprisonment, the sentence shall indicate a special parole term." Congress mandated that a special parole term be imposed. The suspension of the execution of the imprisonment sentence by placing Faherty on probation for three years did not eliminate this requirement. If Faherty successfully completed her period of probation, the special parole term would never be applied. If, on the other hand, Faherty violated the terms of probation she would be required to serve the five year imprisonment sentence, and upon completion of serving her time would be subject to the special parole term provision. The sentence imposed was proper.

We AFFIRM.

JAMES M. BURNS, District Judge, concurring.

I concur with the opinion, and its result. I add some comments on the "special parole term" issue.

Faherty received a typical "split" sentence on the importation count. Five years in prison, the first 120 days in jail and the balance suspended, with three years probation. All of this is a routine kind of sentence, authorized by 18 U.S.C. § 3651. (She also received a "straight" probation sentence of 3 years on the possession count, the probation to run concurrently with that on the importation count.) But the sentencing judge provided, also, on the importation count, that there should be a special parole term (SPT) of three years. Presumably, the sentencing judge believed that he was required to impose a SPT in view of the provisions of 21 U.S.C. § 960, which provides that "If a sentence under this paragraph provides for imprisonment, the sentence *shall* indicate a special parole term." (Emphasis supplied).

Ironically, however, unless Faherty violates her split sentence probation, is revoked for such violation, and the original five year sentence (or some portion of it at least one year and a day in length), comes into play, she will *never* serve the "special parole term." That is because of Section 2.57–01 of the Notes and Procedures Manual of the Parole Commission. Paragraph (d) of that section provides as follows:

"In a 'split sentence' situation, the special parole term is considered to be part of the sentence that was suspended and this will not take effect unless probation is revoked."

As a practical matter, Faherty would never come to the attention of the Parole Commission if the split sentence were served and probation were not revoked. While Faherty would become a "file" for the U.S. Probation Office—because of the probation sentence and would be a "file" for the U.S. Bureau of Prisons—because of the 4 months sentence in a jail type institution, she never became a "file" for the Parole Commission. That is because the Parole Commission, under 18 U.S.C. § 4205, assumes jurisdiction only for the persons sentenced to a term of imprisonment of "more than one year."

Indeed at the time of oral argument, counsel for Faherty was questioned as to whether this issue was properly before us. One might argue with some fervor—and validity, perhaps—that we are being asked to render an advisory opinion. However, the panel has concluded that the question is properly before us, and I join, though reluctantly.

Nor is this the only anomaly in the special parole term field. Another, which we need not reach here, deals with the interplay between the provisions relating to early termination of "regular" parole and that of "special" parole. Section 4211 of Title 18 provides that the Commission is to evaluate and "determine the need for continued supervision[.]" annually, commencing two years after the parolee is released. At the end of five years, "ordinary" parole terminates unless, after a full blown hearing, the Commission determines that "there is a likelihood that the parolee *will* engage in conduct violating any criminal law." § 4211(c) (Emphasis supplied.) 28 C.F.R. 2.43.

Under C.F.R. 2.57(e) these early termination provisions purport to apply to special parole terms as well as ordinary parole terms. Thus, a defendant sentenced, for example, to 10 years in prison and 10 years special parole, if released on "ordinary" parole after say, 3 years, it is likely that he will serve no more than 5 years of ordinary parole, plus, perhaps a minimum amount of special parole time thereafter. Almost cer-

tainly, the SPT will not run beyond 5 years; in all likelihood it will run for perhaps a year or less. Indeed, there is some question whether special parole actually *ever* comes into play in most cases where ordinary parole is terminated early. The regulations, 28 C.F.R. 2.57(e), specify that this is not permitted, but the reality may well not be the same as the regulation. Whether the application of early termination provision of § 4211 should apply to special parole—and whether the Congressional intent is being furthered or frustrated is a question that need not be answered here.