UNITED STATES of America,
Plaintiff-Appellee,

v.

Ismael PEREZ–ESPARZA,
Defendant-Appellant.

No. 79–1092.

United States Court of Appeals,
Ninth Circuit.

Oct. 23, 1979.
Rehearing Denied Jan. 14, 1980.

Joseph A. Milchen, Frank & Milchen, San Diego, Cal., for defendant-appellant.

Barton C. Sheela, III, Asst. U. S. Atty., (on the brief), Michael H. Walsh, U. S. Atty., Barton C. Sheela, III, Asst. U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before CHAMBERS, WALLACE and TANG, Circuit Judges.

WALLACE, Circuit Judge:

Based upon stipulated facts before a district judge, Perez-Esparza was convicted of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). He appeals, asserting that denial of his motion to suppress evidence was reversible error. We agree and reverse.

I

On November 6, 1978, an informer, who had previously supplied Drug Enforcement Administration (DEA) agents with reliable information on 20 to 25 separate occasions, advised DEA agents that a beige 1971 Ford, with California license plates 787–WAX, was being used to smuggle narcotics into the United States from Mexico. This information was entered into the border computer system. On November 9, 1978, the car entered the United States at a border crossing. Because of an error in the computer system the car was not stopped. This information was subsequently relayed to DEA agents who advised law enforcement agencies to watch for the vehicle.

The next morning, pursuant to the alert, the vehicle was stopped at the Border Patrol checkpoint at San Clemente, and was sent to a secondary inspection area. A Border Patrol agent took Perez-Esparza to an office to await the arrival of the DEA agents.

The agents arrived from San Diego about two and one-half hours later. Perez-Esparza was then properly advised of his *Miranda* rights, informed he was being detained because the agents suspected narcotics were being transported in his car, and told that the agents were in the process of obtaining a search warrant. Perez-Esparza told the agents they were welcome to search his car and signed a written consent to that effect. A search of the car revealed cocaine concealed in a headlight.

Subsequent to the discovery of the contraband, Perez-Esparza was again advised of his *Miranda* rights, after which he stated that he had been paid to drive the car to the Los Angeles area and was aware that the car contained cocaine.

Perez-Esparza was charged with (1) importing and attempting to import cocaine, and (2) possession of and intent to distribute cocaine. The district court denied Perez-Esparza's motion to suppress the contraband and statements obtained during his detention. The first count of the indictment was dismissed and Perez-Esparza was convicted of knowingly and intentionally possessing, with intent to distribute, cocaine.

II

The district judge found "probable cause to stop the car." It is not clear to us whether the district judge meant that there was probable cause to search the car or rather that there was reasonable suspicion to stop the car, which, coupled with the

subsequent voluntary consent, validated the search.[1] We conclude he meant the latter and hold that such findings are not clearly erroneous. *See United States v. Cortez,* 595 F.2d 505, 507 (9th Cir. 1979) ("clearly erroneous" standard applies to district judge's finding of "founded suspicion"); *United States v. Rocha-Lopez,* 527 F.2d 476, 477 (9th Cir. 1975), *cert. denied,* 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976) ("founded suspicion" and "reasonable suspicion" mean the same).

 The tip by the reliable informer identifying the car driven by Perez-Esparza as one used to smuggle narcotics into the United States from Mexico provided reasonable suspicion to allow the stop for questioning. *See Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Avalos-Ochoa,* 557 F.2d 1299, 1302 (9th Cir.), *cert. denied,* 434 U.S. 974, 98 S.Ct. 532, 54 L.Ed.2d 466 (1977). We also find no difficulty accepting the finding that Perez-Esparza's statements and his consent to search the vehicle were voluntary. *See United States v. Dubrofsky,* 581 F.2d 208, 212 (9th Cir. 1978) ("clearly erroneous" standard of review applies to district court findings on voluntariness of consent to search). But accepting these findings is not sufficient to affirm the case. There was a three-hour delay between the legal stop and the voluntary consent. We now focus on the legal effect of the events which occurred in that period of time.

### III

Perez-Esparza was taken to a Border Patrol office to await the arrival of DEA agents. Due to the early hour, difficulty finding one of the agents, and the travel time of the agents from San Diego to San Clemente, considerable delay occurred. Our first question is whether the detention of Perez-Esparza for questioning was so similar to an arrest that it required probable cause. We hold, consistent with the Supreme Court's recent decision in *Dunaway v. New York,* —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), that it was. The next question is whether probable cause to "arrest" Perez-Esparza existed. We find it did not.

In *Dunaway,* a detective, acting on an informant's tip which was not reliable enough to support an arrest warrant, "ordered other detectives to 'pick up' [Dunaway] and 'bring him in.'" *Id.* at 2251. The detectives found Dunaway at a neighbor's house, took him into custody, and brought him to the stationhouse in a police car. *Id.* at 2251. Dunaway was then placed in an interrogation room and questioned. *Id.* After receiving *Miranda* warnings, Dunaway waived counsel and divulged incriminating evidence. *Id.*

The Court held in *Dunaway* that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Id.* at 2258. The Court rejected the government's suggestion that it "adopt a multifactor balancing test of 'reasonable police conduct under the circumstances' to cover all seizures that do not amount to technical arrests," *id.* at 2257, stating that "[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific cir-

1. The district judge stated:

 As the Courts have repeatedly stated, each case must stand on its own feet, and taking all the evidence in this case, together with the reasonable inferences to be drawn from the evidence, I think there was probable cause to stop the car. They had the information; as you say, they could have searched it at the border without any search warrant; they had been looking for the car for some time, and the Border Patrol had been notified of the license number and the type of car;

 and when it approached the inspection point, I think there was grounds to stop the car. Then the defendant gave written consent to search it when he was advised that they could get a search warrant. I think taking all this evidence into consideration that there was probable cause to stop it. There was a written consent to search it. The Motion to Suppress the evidence is overruled, and the Motion to Suppress statements [is overruled].

cumstances they confront." *Id.* Because the police lacked probable cause to arrest Dunaway, his detention constituted an illegal "seizure." *Id.*

■ The detention in this case, like that in *Dunaway*, was for the purpose of custodial interrogation. After the legal stop, a Border Patrol agent escorted Perez-Esparza to an interrogation room in the checkpoint station where Perez-Esparza was detained for three hours, including a two and one-half hour delay pending the arrival of the DEA agents. The detention in this case clearly falls within the broad *Dunaway* language and is valid only if supported by probable cause.[2] We thus now turn to the probable cause issue.

■ The only basis for probable cause was the informer's tip, and thus the *Aguilar-Spinelli* two-prong test must be met: the tip must detail (1) facts which show the informer is credible or the information is reliable, and (2) underlying circumstances which verify the validity of the informer's conclusions. *Spinelli v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *United States v. Larkin,* 510 F.2d 13, 14 (9th Cir. 1974).

In this case, the information was given by an informer who had already supplied 20 to 25 tips, which were subsequently verified. Thus the informer is credible and the first part of the test is satisfied. The tip did not, however, relate the circumstances under which the information was obtained. "In the absence of a statement detailing the

---

**2.** Because Perez-Esparza was detained for purposes of custodial interrogation, we need not reach the question posed in *United States v. Mayes,* 524 F.2d 803 (9th Cir. 1975), whether police may detain a suspect pending confirmation or disproof of his voluntary exculpatory statements.

We also do not consider whether, when all officers who are competent to question a suspect are several minutes away, it is constitutionally permissible to detain a suspect briefly on less than probable cause. *See United States v. O'Looney,* 544 F.2d 385, 389–90 (9th Cir.), *cert. denied,* 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976). In *O'Looney,* the police could not have adequately questioned the defendant, a suspected arms smuggler, at the scene of his capture. We thus stated that it was reasonable to transport the suspect to the police station on less than probable cause pending arrival of specialized federal firearms agents. *O'Looney* is different from *Dunaway,* in which the police arbitrarily and without justification chose to bring Dunaway to the station for questioning rather than conduct a less intimidating session at his neighbor's house, *Dunaway v. New York,* 99 S.Ct. at 2251. Arguably, the police conduct in *Dunaway* more clearly demanded the prophylactic safeguards of probable cause, see *id.* at 2254–58, than that in *O'Looney.*

The fundamental issue here is the line of demarcation between a *Terry* "stop" requiring only reasonable suspicion, and the "custodial interrogation" of *Dunaway,* requiring probable cause. How many questions may a police officer ask a suspect before the reach of *Terry* is exceeded? Can the police officer detain the suspect pending a radio check with headquarters for confirmation of the suspect's identity and determination whether arrest warrants are outstanding? If these detentions are permissible, does *Dunaway* automatically govern as soon as the suspect is transported to the station? Or, may the police substitute stationhouse questioning for that permissible on the scene, when the sole purpose is to facilitate questioning by specialized and experienced personnel, as in *O'Looney,* or for other substantial reasons. *Cf. People v. Courtney,* 11 Cal.App.3d 1185, 90 Cal.Rptr. 370 (1970) (allowing transporting of suspect to campus police headquarters for brief interrogation because potentially hostile crowd had gathered at the initial detention scene). We do not think *Dunaway* forecloses using *Terry*-type analysis to solve such problems, when they arise in on-the-scene, unplanned, questioning. The normative distinction between *Dunaway* and *O'Looney* lies in the reasonableness of the police motivations for detaining the respective defendants.

Nevertheless, we need not reach the question whether *O'Looney,* rather than *Dunaway,* should govern on the facts of the case before us, because the record does not supply sufficient police justification for the detention. There is nothing in the record to demonstrate why the Border Patrol agents stationed at the San Clemente checkpoint, who may have been experienced in drug smuggling cases, could not adequately have questioned Perez-Esparza immediately after stopping him. The record is silent as to any real justification for the two and one-half hour detention pending arrival of the DEA agents from San Diego, and the detention was thus unnecessary, even if not quite so egregious as the police conduct in *Dunaway.* Thus, as in *Dunaway,* the detention for custodial interrogation was impermissible on less than probable cause.

manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that [we] may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States, supra,* 393 U.S. at 416, 89 S.Ct. at 589. The Court in *Spinelli* concluded that "[t]he detail provided by the informant in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), provides a suitable benchmark." *Id.* In that case the informer "reported that Draper had gone to Chicago the day before by train and that he would return to Denver by train with three ounces of heroin on one of two specified mornings. Moreover, [the informer] went on to describe, with minute particularity, the clothes that Draper would be wearing upon his arrival at the Denver station." *Id.* at 416–17, 89 S.Ct. at 589.

The information given in this case does not measure up to *Draper.* Although the informant provided general information pertaining to the use of the car in smuggling, he did not specify that a particular shipment of contraband would be transported at a particular time. Identifying a specific vehicle in general use for smuggling lacks the extensive corroborative detail— particulars of a smuggling trip—found sufficient in *Draper.* Thus the information given by the informant does not verify the validity of his conclusions and the second part of the *Aguilar-Spinelli* test is not met. The informant's tip, therefore, does not meet the standard for probable cause.

We thus conclude that while Perez-Esparza was legally stopped for questioning, the Border Patrol lacked probable cause to arrest him and, therefore, could not detain him as was done in this case for custodial interrogation. This leads us to consider whether the contraband and the statements obtained by the agents as a result of the improper detention of Perez-Esparza must be excluded from evidence as the fruit of the government's illegal actions. *Wong Sun v. United States,* 371 U.S. 471, 485–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## IV

The final question is whether the unconstitutional police conduct was sufficiently attenuated from the voluntary consent to search and the inculpatory statements to avoid exclusion from evidence. The DEA agents gave *Miranda* warnings to Perez-Esparza before obtaining his consent to search the car and again before his statements. But proof that statements are voluntarily made after *Miranda* warnings and therefore satisfy Fifth Amendment requirements is "merely a 'threshold requirement' for Fourth Amendment analysis." *Dunaway v. New York, supra,* 99 S.Ct. at 2259 (quoting from *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 516 (1975)).

In *Brown v. Illinois, supra,* 422 U.S. at 601, 95 S.Ct. at 2260, the Supreme Court stated that "[t]he exclusionary rule. . . . , when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth."

Just what "interests and policies" the Fourth Amendment protects, however, are not easy to identify. We have received conflicting signals from the Supreme Court as to whether the sole purpose of the exclusionary rule is to deter unconstitutional police conduct, or whether judicial integrity concerns are equally implicated. *Compare United States v. Calandra,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (mentioning deterrence as "prime purpose" and entirely ignoring judicial integrity considerations) *and Stone v. Powell,* 428 U.S. 465, 485–86, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976) (primary justification for the exclusionary rule is deterrence; judicial integrity "has limited force as a justification for the exclusion of highly probative evidence") *with Brown v. Illinois, supra,* 422 U.S. at 599, 95 S.Ct. 2254 (exclusionary rule protects Fourth Amendment guarantees in two respects: deterrence and judicial integrity). Without any in-depth analysis the Court in *Dunaway* indicated that the exclusionary rule, as an adjunct to the Fourth

Amendment, seeks to deter unconstitutional police conduct and to avoid compromising the integrity of the courts by use of unconstitutionally obtained evidence. *Dunaway v. New York, supra,* 99 S.Ct. at 2259. For purposes of this opinion, where the issue is so similar, we will adopt the *Dunaway* formulation.

■ The Court in *Brown v. Illinois, supra,* announced three factors for courts to consider, beyond the threshold Fifth Amendment question of voluntariness, in determining whether a putative defendant's inculpatory statements subsequent to an illegal arrest must be excluded. These factors are: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct . . .." *Brown v. Illinois, supra,* 422 U.S. at 603–04, 95 S.Ct. 2254, 2262, *quoted in Dunaway v. New York, supra,* 99 S.Ct. at 2259.

The first two factors go primarily to the question whether an illegally arrested or detained defendant's response to police questioning is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States, supra,* 371 U.S. at 486, 83 S.Ct., at 416–417. In *Wong Sun,* the Court thus distinguished between the inculpatory statements of one defendant, Toy, in his bedroom immediately upon being illegally arrested and handcuffed, and those of defendant Wong Sun, who confessed upon returning to the police station several days after being released on his own recognizance. Of course, "free will" in this Fourth Amendment exclusionary rule sense means something apart from "voluntariness," or the absence of coercion, in the Fifth Amendment sense. The "free will" of an inculpating defendant is to be considered in light of the twin policies—deterrence and judicial integrity—of the Fourth Amendment's exclusionary rule. It is not enough for Fourth Amendment attenuation that the statement be uncoerced; the defendant's "free will" must also be sufficient to render inapplicable the deterrence and judicial integrity purposes that justify excluding his statement. In some cases, the intervening, completely self-motivated decision of a putative defendant to inculpate himself is so unforeseeable an event, from the arresting officer's vantage point, that excluding the defendant's statement would serve no deterrent purpose. *See Brown v. Illinois, supra,* 422 U.S. at 610, 95 S.Ct. 2254 (Powell, J., concurring in part); *Durham v. United States,* 403 F.2d 190, 196 (9th Cir. 1968). Moreover, where a defendant makes an unconstrained, independent decision to confess or consent, judicial integrity is not compromised by respecting the defendant's decision to consent to a search or admit his guilt.

The third factor, "the purpose or flagrancy of the official misconduct," which the Court in *Brown v. Illinois, supra,* considered "particularly" important, 422 U.S. at 604, 95 S.Ct. 2254, also has its roots in language from *Wong Sun.* The Court there stated:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by *exploitation of that illegality* or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt 221 (1959).

371 U.S. at 487–88, 83 S.Ct. at 417. (emphasis added).

When police purposely effect an illegal arrest or detention in the hope that custodial interrogation will yield incriminating statements, the deterrence rationale for application of the exclusionary rule is especially compelling. *See Brown v. Illinois, supra,* 422 U.S. at 600–01, 605, 95 S.Ct. 2254; *id.* at 610–12, 95 S.Ct. 2254, (Powell, J., concurring in part). *Cf. United States v. O'Looney,* 544 F.2d 385, 390 (9th Cir.), *cert. denied,* 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976) (deterrence rationale not furthered when detention not motivated by improper purposes); *Allen v. Cupp,* 426 F.2d 756, 759–60 (9th Cir. 1970) (same).

Furthermore, judicial integrity is especially compromised when evidence purposefully acquired through such invasions of constitutional rights is used to convict.

■ With the background of attenuation doctrine and the policies underlying the Fourth Amendment's exclusionary rule thus firmly in mind, we now examine the specific facts surrounding Perez-Esparza's consent and inculpatory statements. In deciding the attenuation issue we must also remember that once the defendant has gone forward with some "specific evidence demonstrating taint," *United States v. Cella*, 568 F.2d 1266, 1284 (9th Cir. 1977), the burden of proof that the taint was attenuated enough to allow admitting the tainted evidence belongs to the government. *Id.* at 1285.

Perez-Esparza's consent to search his car and his subsequent statements were given while he was illegally detained. As in *Dunaway*, no intervening circumstances broke the causal connection between the illegal detention and his consent and statements. *See Dunaway v. New York, supra*, 99 S.Ct. at 2260. While the three hours between the initial illegal detention and the consent and inculpatory statements was more than the two hours between the illegal arrest and confession in *Brown v. Illinois, see* 422 U.S. at 604, 95 S.Ct. 2254, the government did not prove any circumstance which could be considered intervening. Though voluntary, his decision to consent and confess while still in custody, and only three hours after his initial detention, was not an unforeseeable result of his illegal detention. Thus, the deterrence rationale was not vitiated, as in *Wong Sun*, by a lengthy period away from police influences. Nor, for the same reasons, can we find that Perez-Esparza's decision to speak was so independent of police pressures as to absolve the judicial system from the charge of savoring the forbidden fruits of unconstitutional conduct. The first two factors thus dictate a finding of no attenuation.

The last factor, "the purpose and flagrancy of the official misconduct," is more troublesome. Perez-Esparza was never threatened or abused by the police. No guns were drawn, nor handcuffs used, in the arrest. Yet *Dunaway* was decided on very similar facts, 99 S.Ct. at 2253, and the Court specifically rejected the possibility that such facts distinguished *Dunaway* from the earlier case, *Brown v. Illinois*, in which the "purpose and flagrancy" factor was first applied in deciding an attenuation issue.[3]

---

3. The Court stated:

> The situation in this case is virtually a replica of the situation in *Brown*. Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance. Nevertheless, three members of the Appellate Division purported to distinguish *Brown* on the ground that the police did not threaten or abuse petitioner (presumably putting aside his illegal seizure and detention) and that the police conduct was "highly protective of defendant's Fifth and Sixth Amendment rights." . . . This betrays a lingering confusion between "voluntariness" for purposes of the Fifth Amendment and the "causal connection" test established in *Brown*. . . . To admit petitioner's confession in such a case would allow "law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth."

*Dunaway v. New York, supra*, 99 S.Ct. at 2259–60 (footnotes and citations omitted). The similarities between *Brown* and *Dunaway* are perhaps overstated. In *Brown*, unlike *Dunaway*, the police conduct included a warrantless search of the defendant's apartment without probable cause, surprising the defendant on the stairway by his apartment with drawn guns, and handcuffing the defendant on the way to the station.

To the extent that the attenuation inquiry focuses on the purposes of police misconduct, the rather drastic differences between the arrest in *Brown*, which the Court thought was "calculated to cause surprise, fright, and confusion," 422 U.S. at 605, 95 S.Ct. 2254, 2262, and the relatively unintimidating and possibly more excusable detention of Perez-Esparza, *see* note 2 *supra*; should arguably be significant. *See Dunaway v. New York, supra*, 99 S.Ct. at 2260–61 (Stevens, J., concurring) (relevance of "flagrancy" factor is whether defendant was frightened into confessing); *id.* at 2264 (Rehnquist, J., dissenting) (finding sufficient attenuation because police misconduct in *Dunaway* was "in no manner as flagrant" as in *Brown* and because police acted in good faith).

The excuse for Perez-Esparza's detention, that DEA agents familiar with the case had to be summoned from San Diego, does appear somewhat more justifiable, and hence less "flagrant," than the bald desire of the detective in *Dunaway* to interrogate his suspect at the station rather than at his neighbor's house. *See United States v. O'Looney, supra*, 544 F.2d at 389–90; note 2 *supra*. But the additional forty-five minute delay caused by one DEA agent's looking in the wrong place for his partner somewhat undermines this excuse for the lengthy detention. More important, the record does not reveal why the Border Patrol agents present at the scene of the stop could not themselves have questioned Perez-Esparza.

Thus, though we see some distinctions between the police purposes in this case and those condemned in *Brown v. Illinois* and *Dunaway*, the government has not met its burden of proving attenuation. We are not convinced on the record before us that the police conduct involved did not constitute exploitation which should be deterred. Nor are we confident that the facts of this case differ substantially enough from those in *Dunaway* to allow us to deviate from the Court's finding of insufficient attenuation. The Court in *Dunaway* gave short shrift to the "purpose and flagrancy" factor emphasized in *Brown*. Although we do not, *Dunaway's* sweeping language, and the lack of police justification in this case, compel us to conclude that the last factor is insufficient to overcome the lack of attenuation dictated by the first two factors. Therefore, the contraband seized by the agents as well as the statements subsequently made by Perez-Esparza are the fruits of an illegal seizure and should have been suppressed.

V

The conviction of Perez-Esparza on stipulated facts was based on the discovery of the contraband and his statements subsequent to the discovery of the contraband. Therefore, the exclusion of this evidence mandates a reversal of his conviction.

REVERSED.