**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lindoine SANCHEZ–JARAMILLO,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Enrique CRUZ–ALMADA,
Defendant-Appellant.**

Nos. 78–2649, 78–2655.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1980.

Decided April 22, 1980.

As Amended on Denial of Rehearing
May 19, 1980.

Certiorari Denied Oct. 6, 1980. See
101 S.Ct. 166.

Charles R. McKirdy, Michael L. Shakman, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Douglas J. Miller, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and PELL and TONE, Circuit Judges.

CASTLE, Senior Circuit Judge.

Lindoine Sanchez-Jaramillo (Sanchez) and Enrique Cruz-Almada (Cruz) were convicted of making and selling counterfeit alien registration cards (in violation of 18 U.S.C. § 1426(a), (b)) and conspiracy (in violation of 18 U.S.C. § 371). The issue presented for review is whether the district court erred in admitting evidence seized during a warrantless search. We hold that the search violated Cruz' Fourth Amendment rights and that the district court erred in denying Cruz' motion to suppress the evidence seized. We also hold that none of Sanchez' rights were violated. Accordingly, we affirm Sanchez' conviction and reverse Cruz' conviction.

The procedural history of this case requires some explanation. The appellants, along with Jose Flores-Martinez (Flores), were arrested on November 15, 1977 and an indictment was returned against them on April 25, 1978.[1] The appellants moved to suppress evidence seized; a hearing on the motion to suppress was held on June 2, 1978; and on August 8, 1978 the district court entered a Memorandum Opinion and Order denying the motion. Following the denial of the motion, a bench trial was held on November 8, 1978. The evidence at trial was presented by stipulation. The stipulations, in addition to setting forth various facts, incorporated the transcript of the June 2 suppression hearing as a part of the trial record. This Court's jurisdiction is based on 28 U.S.C. § 1291.

I.

On November 1, 1977 Immigration and Naturalization Service (INS) agent Hipolito Acosta ordered and received a counterfeit alien registration card from Flores. INS investigators traced the license plate of the car that delivered the counterfeit card, finding that the car was owned by Sanchez and also determining Sanchez' address. On November 15, 1977 Agent Acosta ordered yet another card from Flores. Soon after the order was placed, Sanchez was seen leaving his apartment (which had been placed under surveillance). Sanchez then met with Flores, returned to his apartment, and then went to a tavern where Flores and Agent Acosta waited. Flores and Sanchez were arrested as they left the tavern and a search of Flores revealed the counterfeit card which Acosta had ordered that evening.

Neither these facts nor the probable cause for Sanchez' arrest are contested. Rather, it is claimed that agents' actions after Sanchez' arrest were improper. INS Agent Chasse testified that, after Sanchez was arrested, Chasse informed Sanchez of his *Miranda* rights; asked if Sanchez would allow agents to search his apartment; and was told by Sanchez that he would allow such a search. INS Agent Acosta testified that upon arriving at Sanchez' apartment, but before entering it, Acosta again asked whether Sanchez would voluntarily allow agents to search the apartment and that Sanchez again said that he would. Upon entering the apartment INS agents identified themselves to Mrs. Sanchez and conducted a "protective search."[2] Agent

---

1. Prior to trial Flores entered a plea of guilty. He is not involved in this appeal.

2. INS agents testified that the "protective search" was only of the room that the agents had just entered and was the only search con-

Acosta testified that agents then seated Mr. and Mrs. Sanchez in the living room; again informed Sanchez of his *Miranda* rights; had Sanchez sign a "notification and waiver of rights" form; and read a "consent to search" form to Sanchez which Sanchez then signed.[3]

As described by the district court the following events then occurred:

> After Sanchez signed the consent to search form, the agents began to search the apartment; two of them entered a bedroom and found the defendant Cruz lying naked in a bed. The first investigator's hand rested on his holster, and he aimed a flashlight in Cruz' face. Cruz gave his name, and the agents advised him of his *Miranda* rights in Spanish. Investigator Chasse then asked what his immigration status was. Cruz said he was a naturalized citizen. Cruz asked and was permitted to put his pants on. Chasse then told Cruz to sit in the living room with Mr. and Mrs. Sanchez. He was told not to move. Cruz then showed Chasse his citizen's card attesting to his naturalized status.

> Soon thereafter, two locked suitcases were found in the bedroom where Cruz had been sleeping. The investigator brought them out into the living room, and asked whose they were. Cruz responded that they belonged to him. The parties dispute what was said next. Investigators Chasse and Acosta testified that Chasse asked Cruz to open the suitcases, and he proceeded to do so. Mrs. Sanchez testified that the agents asked Cruz to open the suitcases. Sanchez testified that the agents *told* Cruz to open the suitcases, but his testimony is doubtful because by its own admission that "I

didn't pay too much attention to what was going on because my wife was very nervous." Finally, Cruz' own testimony was conflicting. On direct and re-direct examination, he testified that the agents ordered him to open the cases; however, on cross-examination, he admitted that he *was not told* he *had* to open the suitcases, but instead was merely *asked* to open the cases.[4]

Mem. Opinion and Order Denying Motion to Suppress at 3–4. The parties do not challenge the district court's depiction of the facts. They do, however, emphasize different facts set forth in the district court's opinion.

The two suitcases were then opened by Cruz. They contained approximately $1,800. in cash, 200 blank counterfeit alien registration cards, and plastic laminate.[5] When questioned about the money, Cruz stated that most of it was proceeds from the sale of alien registration cards in the last couple of weeks. Agents then told Cruz that he was under arrest, again informed him of his *Miranda* rights, and gave him a notification and waiver of rights form which he then signed. Subsequent to his arrest Cruz made several incriminating statements. During the suppression hearing Cruz testified that he made the statements because the agents had already seen the contents of the suitcases.

## II.

Sanchez contends that he did not voluntarily consent to the search of his apartment. Thus, he claims, all of the evidence found in the suitcases was the result of an illegal search. The district court, in deny-

---

ducted before Sanchez signed a "consent to search" form. The protective search revealed no incriminating evidence.

**3.** The notification and waiver of rights form was in Spanish. The consent to search form was in English, but Agent Acosta read the form to Sanchez in Spanish.

**4.** We note that when asked to recount the exact words used by the agent, Cruz testified that the agent merely said "open them."

**5.** The agents' search of the apartment also revealed a third suitcase (the "blue suitcase"). Agents opened the blue suitcase without asking permission from anyone; the contents of the suitcase belonged to Cruz, while the suitcase itself belonged to Sanchez. The district court did suppress the incriminating evidence found in the blue suitcase as to Cruz, but not as to Sanchez. Our analysis of Sanchez' arguments is the same for all three suitcases.

ing the motion to suppress, held that Sanchez voluntarily consented to the search of his apartment.

■ In reviewing Sanchez' claims we note that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). The issue of whether a consent to search is indeed voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). We will not reverse the district court's finding that consent was voluntarily given unless the decision was "clearly erroneous." *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976).

■ In attacking the district court's decision, Sanchez reiterates facts presented at the suppression hearing. However these facts, along with the demeanor of the witnesses, were considered by the district court. Moreover, Sanchez has failed to demonstrate that the district court erred in its evaluation of the voluntariness of the consent. Sanchez presented no evidence that agents made any threats or promises to affect his judgment, nor are there claims of any other form of coercion or misrepresentation. *See United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Sanchez' arrest, although relevant, does not invalidate the consent to search. *Id.* Sanchez' difficulty speaking English did not impair his ability to consent: agents informed him of his rights and otherwise conversed with him in Spanish. The government presented ample evidence of Sanchez' statements of consent and of his signing the consent to search form.[6] We affirm the district court's decision that, viewing the totality of the circumstances, Sanchez' consent was "the product of an essentially free and unconstrained choice." *Schneckloth v. Bustamonte*, 412 U.S. at 225, 93 S.Ct. at 2047 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)).

### III.

Cruz contends that he was illegally detained and that the government has failed to carry its heavy burden of proving that the illegal detention did not taint his "consent" to search the suitcases. Accordingly, he argues, the evidence found in the suitcases must be suppressed and his subsequent inculpatory statements must also be suppressed as the fruit of the unlawful detention.

The district court acknowledged that agents did not have probable cause to arrest Cruz when they entered the bedroom. Nevertheless, the court felt that Cruz' detention was reasonably imposed so that agents could continue to search the apartment unhindered and could determine Cruz' immigration status. The court noted that "[t]his can be viewed as an investigatory stop, similar to that approved in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)." Mem. Opinion and Order Denying Motion to Suppress at 7. The district court went on to hold that Cruz simply complied with a request to open the suitcases; that there was no evidence that agents made any threats; and that "these circumstances indicate a free and voluntary consent by Cruz." *Id.* at 9.

■ The district court's analogy to *Terry* is improper. *Terry* granted police "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an

---

6. The form explicitly notified Sanchez that he had a right to refuse to consent to a search; that any evidence discovered could be used against him; that he was authorizing agents to make a complete search of the premises; and that consent was given "without threats, promises, pressure, or coercion of any kind." Consent to Search Premises Form, Government Exhibit 6.

armed and dangerous individual . . . ." 392 U.S. at 27, 88 S.Ct. at 1883. *See Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). However, Cruz' detention and questioning differed from a *Terry* type of "stop and frisk" both in nature and in scope. Accordingly, *Terry* is not an adequate basis for the agents' actions. Nor can the agents' actions be justified as an attempt to ascertain Cruz' immigration status. Such a detention must be based on a "reasonable suspicion based on specific articulable facts." *Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1070 (7th Cir. 1976), *modified,* 548 F.2d 715 (1977). The government has failed to demonstrate any such "reasonable suspicion" for inquiring into Cruz' immigration status.

■ The agents' actions, regardless of whether they are technically characterized as an arrest, should have been judged by the traditional probable cause standard. *Dunaway v. New York,* 442 U.S. 200, 213–14, 99 S.Ct. 2248, 2256–57, 60 L.Ed.2d 824 (1979). In *Dunaway* the Court declined to apply a balancing or reasonableness test to those seizures which did not amount to formal arrest.[7] The Court reasoned that Dunaway's detention, which was significantly more intrusive than a limited *Terry*-type of "stop and frisk" and which was closely analogous to a traditional arrest, had to be based on probable cause. Despite the factual differences between this case and *Dunaway,* the rationale of *Dunaway* is applicable here. *See United States v. Ashcroft,* 607 F.2d 1167, 1170–71 (5th Cir. 1979). In light of the district court's conclusion that the agents lacked probable cause, we hold that the agents violated Cruz' Fourth Amendment rights when they seized and

detained him. Any "consent" given by Cruz must be viewed accordingly.

■ The government bears a heavy burden of demonstrating that consent given subsequent to an illegal detention was properly obtained. *United States v. Bazinet,* 462 F.2d 982, 989 (8th Cir.), *cert. denied,* 409 U.S. 1010, 93 S.Ct. 453, 34 L.Ed.2d 303 (1972); *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir. 1977). We must determine "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (quoting Maguire, Evidence of Guilt 221 (1959)). *See also United States v. Perez-Esparza,* 609 F.2d 1284, 1288–91 (9th Cir. 1980).

■ In evaluating whether Cruz' acquiescence was obtained by exploitation of the agents' improper conduct, we look at: (1) the temporal proximity of the illegal detention and Cruz' willingness to open the suitcases; (2) the presence of intervening factors between the two events; and (3) the circumstances surrounding, and the nature of, the official misconduct. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975) (arrest followed by inculpatory statements). *See also United States v. Perez-Esparza,* 609 F.2d at 1288–91 (illegal detention followed by consent to search and inculpatory statements); *United States v. Wilson,* 569 F.2d 392, 395–97 (5th Cir. 1978) (illegal arrest followed by consent to search). The voluntariness of Cruz' action is a threshold requirement of admissibility,[8] *Brown v. Illinois,* 422 U.S. at

---

**7.** *Dunaway* involved a defendant who was taken into custody; not told that he was under arrest; driven to police headquarters; placed in an interrogation room; given his *Miranda* warnings; and questioned by officers. The Court held that, except in cases involving certain "narrowly defined intrusions," the proper standard by which to gauge detentions was probable cause. 442 U.S. 212–16, 99 S.Ct. 2256–58. The exceptions included *Terry*-type "stop and frisk" searches and certain border

searches. Neither of these exceptions is applicable here.

**8.** In *Brown* the Court discussed the different interests safeguarded by the application of the exclusionary rule to the Fourth and Fifth Amendments. When used to effectuate the Fourth Amendment, the exclusionary rule was seen as deterring police misconduct and guarding the integrity of the courts. 422 U.S. at 599–600, 95 S.Ct. at 2259–60. Thus, even if the

604, 95 S.Ct. at 2262, and "the burden of showing admissibility rests, of course, on the prosecution." *Id.*

■ Based on the above considerations, we conclude that the government has failed to sustain the burden of proving that the evidence obtained was "sufficiently an act of free will to purge the primary taint." *Brown v. Illinois*, 422 U.S. at 602, 95 S.Ct. at 2261 (quoting *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416). Cruz' acquiescence to the agents' bid that he open the suitcases occurred during the midst of the agents' illegal conduct; there were no intervening circumstances. Cruz, unlike Sanchez, was not told of his right to refuse a search, nor given a consent to search form. *See Schneckloth v. Bustamonte*, 412 U.S. at 227, 93 S.Ct. at 2047. Additionally, the circumstances surrounding the agents' actions indicate that suppression is appropriate. As in *Brown*, the agents' detention of Cruz was investigatory and the manner in which it was effected "gives the appearance of having been calculated to cause surprise, fright, and confusion." *Brown v. Illinois*, 422 U.S. at 605, 95 S.Ct. at 2262.

Accordingly, the district court erred in denying Cruz' motion to suppress the evidence found in the two suitcases. We also conclude that the statements made by Cruz subsequent to the search should be suppressed. The statements were made on two occasions: soon after the agents discovered the contents of the suitcases and the next day, while Cruz was still in custody. Cruz testified that he made the first statements because the agents had already discovered the counterfeiting equipment. It was further stipulated that Cruz would have testified that he made the second statements because agents had seen the contents of the suitcases and also because of the statements he had made the previous evening. The government has offered no evidence to rebut the claim that the statements made were directly tainted by the illegal detention and search.

voluntariness requirement of the Fifth Amendment is met, a Fourth Amendment issue re-

IV.

■ The final issue presented is whether the evidence illegally obtained from Cruz can be used against Sanchez. We hold that it can. Although Sanchez was initially charged with possession of counterfeit alien registration cards, the possession charge was dismissed on motion of the government. None of the counts upon which Sanchez was convicted (conspiracy, making and selling counterfeit cards) are offenses for which possession at the time of the search is an essential element. *Brown v. United States*, 411 U.S. 223, 228, 93 S.Ct. 1565, 1568, 36 L.Ed.2d 208 (1973). Therefore, Sanchez cannot claim "automatic standing" to challenge the search pursuant to *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

Nor can Sanchez claim that "the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 429, 58 L.Ed.2d 387 (1978). In light of our holding that Sanchez consented to a search, there was no Fourth Amendment violation in the search of that area for which consent was given. Moreover, Sanchez had no Fourth Amendment interest in Cruz' property.

Accordingly, Cruz' conviction must be reversed. However, we find that Sanchez' Fourth Amendment rights were not violated. The decision of the district court, therefore, is

Affirmed In Part, and Reversed And Remanded In Part.

TONE, Circuit Judge, concurring.

With the exception of Part III, I join in Judge Castle's well-reasoned opinion. As to the question addressed in Part III, I do not think we need reach the issue of whether Cruz was arrested in violation of the Fourth Amendment when he was told to sit down in the living room and not move. That

mains. *Id.* at 601–02, 95 S.Ct. at 2260–61.

command may have been premised on the agents' reasonable assumption that Cruz, who had just awakened and was clothed only in his pants, lived in the apartment and would have no desire to go out into the cold November night, and on the obvious prudence of putting him, as well as Sanchez and Sanchez' wife, in a place where they would not interfere with the search or have an opportunity to gain access to a weapon that might be hidden in the apartment. I believe we need not rule on the arrest question, because the totality of the circumstances demonstrates that Cruz' consent to the search of the suitcases was not voluntary in any event. The government's theory that it was is based on testimony that Cruz was "asked" or "requested," and not told, to open the suitcases. The phrasing of the agent's utterance is less important, however, than the surrounding circumstances and what was concededly not said. Cruz had just been routed out of bed naked in his darkened bedroom by an agent with a flashlight and a gun. After he had been allowed to put on his pants, he had been told to sit down in the living room and not move. He was surrounded by agents who were in the process of searching the apartment. Finally, he was never informed by anyone that he was not required to open his suitcases. These events and this omission combined to give the agent's "request" the substance of a command and Cruz' "consent to search" the character of an involuntary submission to duress. On the ground that a voluntary consent was not given, I concur in the result reached in Part III.