**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joyce L. WILSON, Defendant–Appellant.**

No. 79–5302.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1980.

Decided Sept. 3, 1980.

Horace W. Baggot, Jr., Richard S. Dodge, Dayton, Ohio, for defendant–appellant.

James C. Cissell, U. S. Atty., Dayton, Ohio, for plaintiff–appellee.

Before CELEBREZZE, MERRITT and JONES, Circuit Judges.

MERRITT, Circuit Judge.

The defendant, Joyce Wilson, appeals her jury conviction of second degree murder in the shooting death of Gary W. Gates and the life sentence imposed by the District Court on the conviction. At trial the defendant's sole defense was that she was not guilty by reason of insanity. The jury found that she was suffering from mental illness but that she was capable of conforming her conduct to the requirements of the law and knew her actions were wrong at the time of the shooting. We reverse the judgment below and remand for a new trial because the written interrogatories submitted to the jury incorrectly shifted the burden of proof on the sanity issue to the defendant.

I.

The evidence introduced on the issue of sanity showed that Joyce Wilson was herself a victim–a victim of mental instability, depression and rejection. When defendant was seven, her parents divorced. She was depressed after the divorce and kept to herself much of the time. Her mother remarried when she was eleven, but she and

her stepfather were not compatible. (TR. Vol. I, p. 194.)

Defendant did not date until her late twenties. Then she had a short-lived affair with a married man. Rejection came after only a few months. Her next relationship with a man lasted only a month or two. At the termination of each relationship, defendant underwent analysis for a brief period of time. Defendant's experience with men–her father, her stepfather and her lovers–was one of continuous rejection.

In February, 1974, Joyce Wilson met Major Gary W. Gates at Wright-Patterson Air Force Base where they both worked. In the beginning Gates was intensely infatuated with her. After only a month, he made a premature proposal of marriage. Shortly thereafter, when Gates' children moved to the base (he had obtained custody in a recent divorce), his relationship with the defendant began to cool.

The defendant, however, was in love. She persisted in trying to keep the relationship alive. Defendant began to "appear" at local lounges Gates frequented in an effort to persuade him to go home with her. She continued to send cards to his children on special occasions and to attend the childrens' athletic events. Gradually, Gates' attachment to defendant lessened. He began seeing other women.

The relationship with Gates terminated completely in the summer of 1977. From that time until Gates' death two years later, defendant attempted to renew her relationship with Gates. Defendant was jealous and obsessed. She began following him, keeping a log of his activities. She purchased disguises and rented automobiles so that Gates would not recognize her. She kept food and water in her car in preparation for the long vigils of surveillance. Her log entries included the mileage Gates traveled each day, who he was with on a given night, and what time of evening the light dimmed in his bedroom. "I hate him for using me . . . ." she wrote, "I cannot accept the injustices of life and the way people use each other . . . [I]t's worthless. Grade school, teased about looks. Later taunted if I liked a boy . . . . Gary hurt me. Gary pushed me too far. Everytime he sees me, threatens action against me, even when not wrong." (TR. Vol. I, p. 194.)

Defendant continued following Gates for more than a year. Then when she became busy at work, she discontinued the log and the surveillance. In May, 1979, however, upon discovering that Gates would be transferred to California, defendant's obsession returned. She became desperate to talk to Gates "to apologize for the harassment."

On the morning of May 29, as he was leaving a building on the base, she approached him in the parking lot. When he saw her, he told her that she was sick and there was nothing he could do for her. She then shot Gates with a pistol. Defendant described what happened:

[H]e made a sound, which startled me at the time, and he spun towards me somewhat. And then I heard a ringing sound in my ears, and then I noticed that–well, he spun towards me, I did jump backwards. I was startled by that action. Then I heard the ringing sound in my ears, and then I was–I noticed he was lying on the ground . . . .. I was scared. And I got in my car and drove away. (TR. Vol. II, p. 275.)

Defendant drove to another parking lot. She changed the license plates on her car, changed into tennis shoes, a heavier jacket and a wig, and walked into the woods. She remained in the woods for two days. During that time defendant consumed a prescription of Darvon and was sick. She later told FBI agents that she contemplated shooting herself but could not. On the second day defendant left the woods. As she walked into the parking area, she identified herself to FBI agents, "That's my car. I'm Joyce. I think you're looking for me." (TR. Vol. I, p. 146.) Later that evening defendant Wilson gave the police a complete statement concerning the shooting.

## II.

█ Defendant Wilson clearly made out a prima facie defense of insanity. This

Court has held that "[o]nce a prima facie defense of insanity has been raised, the Government has the burden of proving beyond a reasonable doubt that the defendant was sane." *United States v. Smith*, 437 F.2d 538, 541 (6th Cir. 1970). The Government therefore had the burden to prove the defendant sane.

■ Defendant contends that the written interrogatories which were submitted to the jury shifted the burden of proof to the defendant by requiring a unanimous decision as to her sanity. The interrogatories submitted asked the jury in writing to answer "Yes" or "No" to the following questions:

Question No. 1. Do you *unanimously* find that the defendant Joyce Wilson suffered from a mental illness on May 29, 1979?

If you have answered Question No. 1 no–that is, she was not suffering from a mental illness–you need not answer Question No. 2 or Question No. 3. You should disregard the defense of insanity and limit your consideration to other issues that have been described in these instructions.

If you have answered Question No. 1 yes–that is, that she was suffering from a mental illness on May 29th–then you must answer Questions 2 and 3.

Question No. 2. Do you *unanimously* find that the mental illness of the defendant Joyce Wilson on May 29th, 1979 was such as to prevent her from knowing the wrongfulness of her act?

Question No. 3. Do you *unanimously* find that the mental illness of the Defendant Joyce Wilson on May 29th, 1979, was such as to render her substantially incapable of conforming her conduct to the requirements of the law she is charged with violating?

If you have answered both Question No. 2 and Question No. 3 no, you should disregard the defense of insanity and limit your consideration to the other issues described in these instructions.

If you have answered either Question No. 2 or Question No. 3 yes, you should render a verdict of not guilty because of the defendant's lack of criminal responsibility. (TR. Vol. II, p. 606, 607.)

The District Court's interrogatories were modeled on the guidelines this Court set forth in *United States v. Smith*, 404 F.2d 720 (1968), for instructing a jury concerning the defense of insanity.[1] We did not suggest in that case, however, that written interrogatories should be used. Nor did we imply that the jury would have to find the defendant "insane" by a "unanimous" verdict or otherwise return a verdict of guilty. The reason we did not make this suggestion is because such an instruction combined with written interrogatories, in effect, shifts the burden of proof to the defendant.

The court's use of the word "unanimous" could easily mislead the jury into believing that unless all twelve found that defendant was insane, no one could so find. In other words, even if eleven jurors felt that defendant Wilson did not know what she was doing at the time of the commission of the crime, then the jury would have to answer "No" to Question No. 2 and Question No. 3 because the twelfth juror thought otherwise. This would preclude a hung jury on the insanity defense. The wording of the instructions, "If you have answered Ques-

---

1. In *Smith* we adopted the test for criminal responsibility from the Model Penal Code. The questions for jury consideration when the defendant offers an insanity defense were stated as follows:

1. Was he suffering from a mental illness at the time of the commission of the crime?
2. Was that illness such as to prevent his knowing the wrongfulness of his act?
3. Was the mental illness such as to render him substantially incapable of conforming his conduct to the requirements of the law he is charged with violating?

A negative finding as to the first question or negative findings as to both the second and third questions would require rejection of the insanity defense. An affirmative finding as to the first question, plus an affirmative finding as to either the second or the third question, would require a jury verdict of "not guilty" because of defendant's lack of criminal responsibility. 404 F.2d at 727.

In the present case the jury answered the first question in the affirmative and the latter two in the negative.

tion No. 2 and 3 no you should disregard the defense of insanity" (TR. Vol. II, p. 607), could lead the jury into thinking that unless all twelve found defendant insane, no one could then vote not guilty by reason of insanity. Through the use of special interrogatories requiring a unanimous decision on the insanity defense, the burden of proof was thus shifted to the defendant to prove her insanity.

This case thus illustrates one danger of using special interrogatories in criminal cases—the likelihood of confusion and the shifting or weakening of the government's burden of proof—but there are other dangers as well. The question of the propriety of special interrogatories or verdicts dates back to controversies in England about the principle that a jury had a right to render a general verdict without being compelled to return a number of subsidiary findings to support its general verdict.[2] As Judge Aldrich said in *United States v. Spock*, 416 F.2d 165, 180–81 (1st Cir. 1969):

> This principle is so well established that its basis is not normally a matter of discussion. There is, however, a deep undercurrent of reasons. Put simply, the right to be tried by a jury of one's peers finally exacted from the king would be meaningless if the king's judges could call the turn. Bushel's Case, 124 Eng.Rep. 1006 (C.P.1670). In the exercise of its functions not only must the jury be free from direct control in its verdict, but it must be free from judicial pressure, both contemporaneous and subsequent. *Commonwealth v. Anthes*, 1857, 71 Mass. (5 Gray) 185, 209–10; *Rex v. Larkin*, [1943] K.B. 174; P. Devlin, Trial by Jury 14, 56, 75–91 (3d impr. with addendum, 1966); T. Plucknett, A Concise History of the Common Law 137–38 (5th ed. 1956); Howe, Juries as Judges of Criminal Law, 52 Harv.L.Rev. 582 (1939). Both have been said to result from the submission of special questions.

> "It is one of the most essential features of the right of trial by jury that no jury should be compelled to find any but a general verdict in criminal cases, and the removal of this safeguard would violate its design and destroy its spirit."

G. Clementson, Special Verdicts and Special Findings by Juries, 49 (1905). (Footnotes omitted.)

For these reasons, the Federal Rules of Criminal Procedure make no provision for special verdicts or interrogatories in criminal cases as do the Federal Rules of Civil Procedure in civil cases.[3] Rule 23(c) of Fed-

---

2. Statements by Mr. Justice Black and Mr. Justice Douglas on the Rules of Civil Procedure and the Proposed Amendments, 31 F.R.D. 617, 618 19 (1963).

3. Fed.R.Civ.P. 49:

Rule 49. Special Verdicts and Interrogatories

(a) Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. . . .

(b) General Verdict Accompanied by Answer to Interrogatories. The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict. When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict,

eral Rules of Criminal Procedure provides only for special findings by the judge in a case tried *without* a jury.[4]

The submission of special verdicts by the Court in criminal cases tried by a jury has been held to be error.[5] It has been held that submitting special questions to the jury invades the province of the jury[6] and "infringes on its power to deliberate free from legal fetters; on its power to arrive at a general verdict without having to support it by reasons or by report of its deliberations; and on its power to follow or not to follow the instructions of the court. . . ." *United States v. Spock*, 416 F.2d 165 (1st Cir. 1969).

In criminal cases, a jury is entitled to acquit the defendant because it has no sympathy for the government's position. It has a general veto power, and this power should not be attenuated by requiring the jury to answer in writing a detailed list of questions or explain its reasons. The jury's veto power was settled in *Throckmorton's* case in 1544 according to Professor Plucknett:

In Crompton's treatise on the jurisdiction of courts (1594) we read:

"Note that the London jury which acquitted Sir Nicholas Throckmorton, Knight, about the first year of Queen Mary, of high treason, was called into the Star Chamber in October, 1544 (sic), forasmuch as the matter was held to have been sufficiently proved against him; and eight of them were there fined in great sums, at least five hundred pounds each, and remanded back to prison to dwell there until further order were taken for their punishment. The other four were released, because they submitted and confessed that they had offended in not considering the truth of the matter."

. . .

Throckmorton's prominent share in Wyatt's rebellion put his guilt beyond the slightest question, but he was a protestant hero to the Londoners, and the jury's verdict was purely political. From now onwards the jury enters on a new phase of its history, and for the next three centuries it will exercise its power of veto on the use of the criminal law against political offenders who have succeeded in obtaining popular sympathy.

Plucknett, A Concise History of The Common Law 133–34 (5th ed. 1956).

For limited purposes in federal criminal proceedings special questions have been permitted, but the cases are rare, and they are distinguishable. *See Heald v. Mullaney*, 505 F.3d 1241 (1st Cir. 1974) (special verdict harmless in accomplice to a robbery case); *United States v. Borelli*, 336 F.2d 376 (2d Cir.), *cert. denied sub nom. Cinquegrano v. United States*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1964) (conspiracy trial in which court held special verdicts necessary for statute of limitations purposes determining when and if defendant withdrew from conspiracy); *Kawakita v. United States*, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952) (in action for treason special verdicts necessary to show commission of overt acts).

---

judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

4. Fed.R.Crim.P. 23(c):

(c) Trial Without a Jury. In a case tried without a jury the court shall make a general finding and shall in addition, on request made before the general finding, find the facts specially. Such findings may be oral. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein.

5. *See Gray v. United States*, 174 F.2d 919 (8th Cir.), *cert. denied*, 338 U.S. 848, 70 S.Ct. 90, 94 L.Ed. 519 (1949); *United States v. Spock*, 416 F.2d 165 (1st Cir. 1969); *United States v. Ogull*, 149 F.Supp. 272 (S.D.N.Y.1957).

6. *See United States v. Ogull*, 149 F.Supp. 272 (S.D.N.Y.1957) ("To ask the jury special questions might be said to infringe on its power to deliberate free from legal fetters . . . ."); *see also* 8A Moore's Federal Practice and Procedures § 31.02[3] and 2 Wright, Federal Practice and Procedure § 512.

In general, special verdicts are not favored[7] and "may in fact be more productive of confusion than of clarity." 8A Moore's Federal Practice and Procedure § 31.02[3] at 31–9. We believe that the special interrogatories in this case did confuse the jury and, literally applied, shifted the burden of proof on the issue of sanity to the defendant. We, therefore, set aside the jury's verdict and remand the case to the district court for a new trial.

### III.

Defendant also contends that her confession was involuntary and that the trial court erred in not holding an evidentiary hearing on the question. The difficulty with this argument is that the defendant did not challenge the use of her confession at trial. When the trial court itself raised the question of admissibility of the confession,[8] defense counsel replied that he had no objection. Since we are remanding the case for a new trial on other grounds, the defendant may now raise this question in the District Court and request an evidentiary hearing. We, therefore, do not decide this issue.

Since the effect of our ruling is to vacate the judgment and sentence below, we do not rule on the question of whether the life sentence imposed by the District Court was within the sentencing discretion of the Court.

Accordingly, the judgment of the District Court is reversed and the case is remanded for a new trial.

CELEBREZZE, Circuit Judge, concurring.

I concur in the result reached and the reasoning employed in the majority opinion, but write separately to emphasize my view that the test for criminal responsibility adopted by this court in *United States v. Smith*, 404 F.2d 720 (6th Cir. 1968), has in no way been modified by the majority opinion in this case. The court only holds that the use of special interrogatories, literally applied, shifted the burden of proof on the issue of insanity to the defendant. *United States v. Smith, supra*, continues to articulate the law on the issue of insanity in our circuit.

---

7. *See United States v. O'Looney*, 544 F.2d 385, 392 (9th Cir. 1976) ("As a rule, special verdicts in criminal cases are not favored."); *Heald v. Mullaney*, 505 F.2d 1241, 1245 (1st Cir. 1974) ("We have little doubt that, in general, the use of special questions and verdicts in any criminal proceeding, state or federal, is suspect not only as a matter of sound judicial policy but of due process as well.")

8. The Court: "It's my understanding that there may be a question of admissibility of a statement by the Defendant when she came out of the woods. Am I correct, or is that not an issue here?" (TR. Vol. I, p. 102.)