*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0150p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 03-2538

PATRICK MICHAEL STONEFISH,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-81106—Arthur J. Tarnow, District Judge.

Argued: January 28, 2005

Decided and Filed: March 30, 2005

Before: MERRITT, MOORE, and GILMAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Robert J. Dunn, Bay City, Michigan, for Appellant. Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Robert J. Dunn, Bay City, Michigan, for Appellant. Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

───────────────

## OPINION

───────────────

RONALD LEE GILMAN, Circuit Judge. Patrick Michael Stonefish was driving a car with seven Chinese nationals inside when he was arrested as he headed toward Detroit on Interstate 94. A jury convicted Stonefish of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). The district court then sentenced him to 30 months in prison. On appeal, Stonefish argues that the district court (1) erred in concluding that there was sufficient evidence to support the jury's guilty verdict, (2) committed plain error in using a special verdict form that allegedly did not require the jury to find him guilty of all of the essential elements of the crime, and (3) erred in failing to grant him a three-point reduction in his base-offense level because he allegedly did not transport the illegal aliens with a profit motive. For the reasons set forth below, we **AFFIRM** the judgment of the district court with respect to the sufficiency of the evidence and the use of the special verdict form, but express **NO OPINION** regarding its failure to reduce Stonefish's base-offense level because this issue was mooted when Stonefish was released from federal custody.

1

## I.  BACKGROUND

On the evening of December 9, 2002, United States immigration agents were monitoring an abandoned parking lot on the American side of the St. Clair River near Algonac, Michigan.  The parking lot was known to have been used in the past by smugglers of illegal aliens.  At about 8 p.m., the agents observed a gray station wagon pull into the parking lot, extinguish its lights, wait a few minutes, and then drive away.  The car returned and repeated this pattern once more before 10 p.m.

Meanwhile, on the Canadian bank of the St. Clair River, seven Chinese nationals were loaded into a small wooden boat and piloted across the river to the American side.  The agents observing the parking lot saw the boat pull to shore, unload its passengers in the shadows near the river's bank, and then leave.  After the passengers had been crouching in the snow near the water for about 20 minutes, the station wagon once again returned to the parking lot at 10:25 p.m.  When the driver got out of the car and motioned to the people huddled by the river, they all quickly climbed in.  The car then left the parking lot.  After taking a circuitous route, the car eventually made its way to Interstate 94 and began heading west toward Detroit.  Soon after the car entered the interstate highway, it was pulled over by immigration agents.  The driver of the station wagon (Stonefish) and the seven Chinese nationals were arrested.

None of the passengers in the car spoke English.  Nor had any of them ever met Stonefish prior to that evening.  When they were later questioned, the passengers told the immigration authorities that Stonefish spoke some words to them in English, but that they did not understand what he was saying.  They also reported that there was no communication between Stonefish and his passengers about where they were going.

Testimony offered at trial by the immigration agents monitoring the parking lot and by the seven passengers in the car indicated that Stonefish was a part of a large conspiracy to smuggle Chinese nationals into the United States.  The members of the conspiracy assisted aliens in emigrating to Canada, crossing the St. Clair River, entering into the United States illegally, and then traveling by car to New York City.

Following his conviction by the jury for transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), Stonefish made an oral pro se motion to arrest judgment pursuant to Rule 34 of the Federal Rules of Criminal Procedure.  Shortly thereafter he also filed a written pro se motion under 28 U.S.C. § 2255 to vacate his sentence.  The district court heard oral argument on both motions, at which time Stonefish was represented by new counsel.  After denying his motions, the district court sentenced Stonefish to 30 months in prison.  This timely appeal followed.

## II.  ANALYSIS

**A.**      **The evidence was sufficient to support the jury's finding that Stonefish was guilty of transporting illegal aliens**

Stonefish argues that the evidence presented at trial was insufficient to support the jury's determination that he "knew that the passengers he transported were illegal immigrants," or that he transported them "willfully in furtherance of an illegal scheme."  In evaluating this claim, we must "view the evidence in the light most favorable to the government and will affirm the jury's verdict unless no rational trier of fact could have found, beyond a reasonable doubt, that [Stonefish] committed the offenses charged."  *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir. 1992) (en banc) ("Our review of the sufficiency of the evidence is quite limited.").

Stonefish was convicted of violating 8 U.S.C. § 1324(a)(1)(A)(ii), which provides that the offense of transporting illegal aliens is committed by any person who,

knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

"The 'violation of law' to which the provision refers is the illegal alien's continued illegal presence in the United States." *United States v. 1982 Ford Pick-Up*, 873 F.2d 947, 950 (6th Cir. 1989). In order to find that a defendant has acted "in furtherance of such violation of law," a court must conclude that the specific intent of the person transporting the illegal aliens was "to deliberately assist an alien in maintaining his or her illegal presence" in this country. *Id.* at 951. This court has determined that there is a "principled distinction between acts performed with the purpose of supporting or promoting an alien's illegal conduct, and acts which are incidental to or merely permit an individual to maintain his existence." *Id.* (citation and quotation marks omitted). Accordingly, a person who knowingly gives an alien a ride to a homeless shelter may not be prosecuted under the above statute for transporting an illegal alien. *Id.* In contrast, a person who knowingly smuggles illegal aliens across the country may properly be convicted thereunder. *Id.*

At trial, the government bore the burden of establishing beyond a reasonable doubt that Stonefish acted with the requisite state of mind; i.e., that he willfully transported the seven Chinese nationals with the intent of supporting and promoting their illegal presence in the United States. *See id.* at 950-51 (noting that, in interpreting the statute, the court is "guided by the fact that as a penal statute it must be strictly construed") (quotation marks omitted). Stonefish alleges that the government failed to show his specific intent because it introduced no evidence that he was ever compensated or that he knew where the aliens he transported wished to go. He insists that the evidence presented at trial "could just as easily be characterized as a humanitarian gesture picking up human beings shivering in the cold out in the night."

In discerning Stonefish's state of mind, the jury was permitted to consider any credible evidence, direct or circumstantial, regarding his intentions in transporting the Chinese nationals. *See 1982 Ford Pick-Up*, 873 F.2d at 951. This may include consideration of "whether the defendant was compensated for the transportation, what efforts the defendant took to conceal or harbor the illegal aliens[,] and whether the illegal aliens were friends, co-workers, or companions of the defendant, or merely human cargo that was being shipped." *United States v. Perez-Gonzalez*, 307 F.3d 443, 445-46 (6th Cir. 2002) (citation and quotation marks omitted). Stonefish makes much of the fact that "[t]here was no evidence that he was ever compensated" for transporting the Chinese nationals.

True enough, there was no direct evidence presented at trial regarding whether the illegal aliens in Stonefish's car paid anyone to get them from China to the United States. The district court determined, sua sponte and perhaps erroneously, that this information was irrelevant and prejudicial. Significant circumstantial evidence was presented, however, suggesting that Stonefish's only possible motive was monetary. He did not know any of the aliens that he picked up, could not communicate with any of them to determine where they wanted to go, and did not explain why he was periodically checking on this abandoned parking lot late at night on December 9, 2002. Moreover, Stonefish presented no evidence to rebut the inference that he was being compensated for transporting the Chinese nationals.

Evidence was also presented that Stonefish took considerable pains to conceal and harbor the Chinese nationals. He met them late at night in an isolated location across from the Canadian border, turned off the lights on the car he was driving, motioned to them to get into the car instead of calling out to them, and then took a circuitous route to the interstate highway. In *Perez-Gonzalez*, 307 F.3d at 444, 446, the fact that the defendant had taken "a rather unusual route" and "purposely

departed late at night" was found to be strong evidence supporting the defendant's conviction for transporting illegal aliens.

Furthermore, the Chinese nationals who testified at Stonefish's trial said that they squatted in the shadows and traveled at night because they were "scared the cops would find us." Stonefish offered no explanation for his suspicious actions and failed to rebut the inference that he was attempting to smuggle the illegal aliens into the United States. *See Perez-Gonzalez*, 307 F.3d at 446 (concluding that evidence that the illegal aliens "were also clearly attempting to evade the law" supported the jury's verdict that the defendant had intentionally transported them).

In addition, Stonefish failed to demonstrate that the aliens were anything more to him than "human cargo," *Perez-Gonzalez*, 307 F.3d at 446, that he was transporting to New York City. *Cf. 1982 Ford Pick-Up*, 873 F.2d at 952 (finding that the defendants were not guilty of transporting illegal aliens where "[t]heir purpose was to promote the well-being of friends and relatives by helping them obtain employment"). Stonefish concedes in his brief that "there was no evidence that any of the illegal aliens were friends, co-workers, or companions" of his.

Although Stonefish contends that the above circumstantial evidence was equally consistent with a finding that he had welcomed the Chinese nationals into his vehicle solely as a humanitarian gesture, the jury was free to find that the evidence was sufficient to convict Stonefish of intentionally transporting the illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). *See Perez-Gonzalez*, 307 F.3d at 445 ("We may find sufficient evidence even though the circumstantial evidence does not remove every reasonable hypothesis except that of guilt.") (citation and quotation marks omitted). We therefore conclude that the evidence was sufficient to support the jury's verdict.

**B.      The district court did not commit reversible error by using a special verdict form**

Stonefish also argues that the district court clearly erred in using a special verdict form "which required the jury to specify which of the two theories under which they found the defendant guilty." The use of a special verdict form in a criminal case is normally reviewed for an abuse of discretion, *United States v. Kimes*, 246 F.3d 800, 810 (6th Cir. 2001), but because Stonefish did not object at trial, his appeal on this issue must be analyzed under the "plain error" standard of review provided by Rule 52(b) of the Federal Rules of Criminal Procedure. *See United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998) (reviewing "for plain error the use of a special verdict where there was no defense objection").

Rule 52(b) provides that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." The Supreme Court has said that "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights." *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (citation and quotation marks omitted). Where all three of these conditions are met, "an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467 (citation and quotation marks omitted).

In support of his argument that the district court committed plain error in using a special verdict form, Stonefish points out that "there is no provision in the Federal Rules for special verdict forms in criminal cases," and that the "Sixth Circuit has held that special verdict forms are not favored." Stonefish is correct that, "[i]n general, special verdicts are not favored and may in fact be more productive of confusion than of clarity." *United States v. Wilson*, 629 F.2d 439, 444 (6th Cir. 1980) (citation and quotation marks omitted). This court has held that general verdicts in criminal cases are preferred because "a jury is entitled to acquit the defendant because it has no sympathy for the government's position. It has a general veto power, and this power should not be

attenuated by requiring the jury to answer in writing a detailed list of questions or explain its reasons." *Id*. at 443.

But the pronouncement that special verdicts are disfavored in criminal cases does not compel the conclusion that the district court erred in using a special verdict in Stonefish's case. The Sixth Circuit found in 1980 that the use of special verdict forms in criminal cases was "rare" and that this fact supported the court's decision to set aside the jury's verdict. *Wilson*, 629 F.2d at 443. Over the course of the last two decades, however, "[e]xceptions to the general rule disfavoring special verdicts in criminal cases have been expanded and approved in an increasing number of circumstances." *Reed*, 147 F.3d at 1180-81 (reviewing cases from eight different federal circuits, and concluding that "[t]hese cases make it clear that use of a special verdict form is a matter of the district court's discretion to be determined on the facts of each case").

Special verdict forms should not be used in cases where they confuse the jury or improperly shift the burden of proof on an issue from the government to the defendant. *Wilson*, 629 F.2d at 444. Stonefish contends that in his case "the form must have confused the jury since they had a question regarding the two different theories upon which the Defendant could be convicted." The special verdict form contained the following language:

We the jury, after due deliberation, unanimously find as follows:

(1) We find that the defendant transported the aliens within the U.S., knowing that they had come to, entered or remained in the country illegally.
Yes_____    No_____.
                              -OR-
(2) We find that the defendant transported the aliens within the U.S., with reckless disregard to the fact that they had come to, entered or remained in the country illegally.
Yes_____    No_____.

The special verdict form required that the jury unanimously agree and then check one of the lines to indicate the theory upon which it was basing its verdict. There was thus no danger that some jurors voted to convict Stonefish based on their belief that his conduct was knowing while other jurors convicted him because they believed that he acted with reckless disregard. *See United States v. Kimes*, 246 F.3d 800, 810 (6th Cir. 2001) (noting that a special verdict form may be used to ensure that a jury is "unanimous on which type of conduct occurred" before convicting a defendant). Because Stonefish has not demonstrated how under the circumstances of his case the jury could have been confused, the district court cannot be said to have abused its discretion, much less committed plain error, in using a special verdict form. *See Reed*, 147 F.3d at 1181 ("Where a special verdict form requires the jury to determine the occurrence of any of a series of acts, each of which is sufficient to constitute the indicated crime, the traditional concerns regarding special verdicts are not implicated.").

Stonefish further argues that even if the use of a special verdict form was appropriate in this case, the court erred in using a form that "did not provide that the jury find the essential elements of the charged offense." Citing longstanding Supreme Court precedent, Stonefish contends that a special verdict form must contain all of the elements of the crime charged or else the jury's verdict must be set aside. *See United States v. Jackalow*, 66 U.S. 484 (1861) ("A special verdict finding that the offence was committed by the prisoner at a place designated, but omitting to find that it was outside the limits of any State, must be set aside."). *But see United States v. Robbs*, No. 01-2043, 2003 WL 22128710, at *7 (6th Cir. Sept. 12, 2003) (unpublished) (finding that the special verdict form improperly omitted an element of the charged crime, but affirming the conviction because the jury instructions adequately informed the jury of its obligation to find the element).

Stonefish alleges that the special verdict form in his case was inadequate because it did not require the jury to find that he knew that the Chinese nationals he transported were illegal aliens or that he intended to further his passengers' illegal presence in the United States. But the special verdict form did require that the jury find that Stonefish had transported the aliens either "knowing that they had . . . entered . . . illegally" or "with reckless disregard to the fact that they had come to, entered or remained in the country illegally." The first of Stonefish's contentions is thus easily dismissed.

His second objection to the special verdict form, however, is more problematic. Nowhere on the special verdict form does it state that the jury was required to find that Stonefish transported the illegal aliens for the purpose of furthering their illegal presence in the United States. A person who knowingly gives an illegal alien a ride to a homeless shelter could be convicted under the law as it is stated in the special verdict form used in this case. *See United States v. 1982 Ford Pick-Up*, 873 F.2d 947, 950-51 (6th Cir. 1989) ("The mere transportation of a person known to be an alien is not sufficient to constitute a violation of the section. . . . [A] person must act so as to deliberately assist an alien in maintaining his or her illegal presence.") (citation and quotation marks omitted). Looking at the jury instructions as a whole, however, reveals that the jury in this case was informed that there were four elements that must be found in order for it to convict Stonefish, one of which was that he had transported "the person in order to help him remain in the United States illegally" and not for some "other innocent reason." *See Kimes*, 246 F.3d at 810 (stating that "the trial court's instructions should be read as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury") (quotation marks omitted).

We therefore conclude that the jury instructions as a whole were proper in the present case. In addition, Stonefish failed to object to the use of the special verdict form at his trial, so he must show that the district court's actions constituted plain error under Rule 52(b) of the Federal Rules of Criminal Procedure. This means that he "must demonstrate prejudice as a result of the error." *United States v. Lowenstein*, 1 F.3d 452, 454 (6th Cir. 1993). Because there was substantial evidence presented at trial that Stonefish acted with the intent to help his passengers remain in the United States illegally, and because the jury was instructed that it must find as such, we conclude that Stonefish's objection to the special verdict form does not survive the plain error standard of review.

**C.     The issue of whether the district court erred in refusing to grant Stonefish a reduction in his sentencing level is now moot**

Stonefish finally contends that the district court should have granted him a three-point reduction in his base-offense level because he allegedly did not profit while committing the offense. The United States Sentencing Guidelines § 2L1.1(b)(1) provides for a reduction if the defendant transported aliens "other than for profit," or if the defendant was transporting only his spouse or children. Although Stonefish's claim would ordinarily require analysis in light of *United States v. Booker*, 125 S.Ct. 738 (2005), the issue has been mooted because Stonefish was released from federal custody on February 10, 2005. *See* Letter from Patricia G. Gaedeke, Assistant United States Attorney (Feb. 23, 2005) (stating that Stonefish was released from a halfway house on February 10, 2005). We therefore express no opinion on this claim.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court with respect to the sufficiency of the evidence and the use of the special verdict form, but express **NO OPINION** regarding its failure to reduce Stonefish's base-offense level because this issue was mooted when Stonefish was released from federal custody.